UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------X

UNITED STATES OF AMERICA,                    Hon. Esther Salas

        - against -                    Crim. No. 12-298 (S-2) (ES)

FARAD ROLAND,

                Defendant.

---------------------------------------------------X


**RESPONSE IN OPPOSITION TO GOVERNMENT'S
MOTION TO DISQUALIFY THOMAS AMBROSIO, ESQ.**

RICHARD JASPER, ESQ.
276 Fifth Avenue, Suite 501
New York, NY 10001
(212) 689-3858

THOMAS AMBROSIO, ESQ.                    MICHAEL K. BACHRACH, ESQ.
750 Valley Brook Avenue                    276 Fifth Avenue, Suite 501
Lyndhurst, N.J. 07071                    New York, New York 10001
(201) 935-3005                    (212) 929-0592

*Attorneys for Defendant Farad Roland*

# **Table of Contents**

Table of Authorities ................................................................................. ii

Preliminary Statement.................................................................................1

NEITHER THE FACTS NOR THE LAW SUPPORT THE
GOVERNMENT'S MOTION TO DISQUALIFY MR. AMBROSIO....................2

    A.    The Relevant Facts ...............................................................2

    B.    No conflict exists that warrants Mr. Ambrosio's disqualification........9

    C.    The Government's hypotheticals should be rejected out-of-hand ......15

    D.    The procedure to follow if this Court believes a waiver would
        assist the instant proceedings ..............................................31

    E.    The appropriateness of an interlocutory appeal irrespective of the
        outcome of the instant motion............................................33

Conclusion ..............................................................................................36

# **Exhibit**

Declaration of Thomas Ambrosio, Esq.,
dated, December 28, 2015 ........................................................Exhibit A

## **Table of Authorities**

FEDERAL CASES

Armienti v. United States,
313 F.3d 807 (2d Cir. 2002) ........................................................................10

Arizona v. Fulminante,
499 U.S. 279 (1991)..............................................................................9, 34

Black v. United States,
561 U.S. 465 (2010)....................................................................................35

Brady v. Maryland,
373 U.S. 83 (1963)...............................................................................23, 24

Chambers v. NASCO, Inc.,
501 U.S. 32 (1991).....................................................................................36

Cuyler v. Sullivan,
446 U.S. 335 (1980)...................................................................10, 11, 12

Degen v. United States,
517 U.S. 820 (1996)....................................................................................36

Eisemann v. Herbert,
401 F.3d 102 (2d Cir. 2005) ........................................................................11

Faretta v. California,
422 U.S. 806 (1975)....................................................................................17

Flanagan v. United States,
465 U.S. 259 (1984)...............................................................................33, 34

Florida v. Nixon,
543 U.S. 175 (2004)...............................................................................21, 22

Gardner v. Florida,
430 U.S. 339 (1977)....................................................................................35

Glasser v. United States,
315 U.S. 60 (1942).................................................................10

Government of the Virgin Islands v. Zepp,
748 F.2d 125 (3d Cir. 1984) .............................................10, 12

Jones v. Barnes,
463 U.S. 745 (1983)..............................................................22

Kyles v. Whitley,
514 U.S. 419 (1995)..............................................................23

Link v. Wabash R. Co.,
370 U.S. 626 (1962)..............................................................36

Powell v. Alabama,
287 U.S. 45 (1932)................................................................17

Strouse v. Leonardo,
928 F.2d 528 (2d Cir. 1991) .................................................14

Strickland v. Washington,
466 U.S. 668 (1984)..............................................................21

Sullivan v. Louisiana,
508 U.S. 275 (1993)..............................................................34

Taylor v. Illinois,
484 U.S. 400 (1988)..............................................................22

Tueros v. Greiner,
343 F.3d 587 (2d Cir. 2003) .................................................10

United States v. Agurs,
427 U.S. 97 (1976)................................................................24

United States v. Curcio,
680 F.2d 881 (2d Cir. 1982) .............................................14, 33

United States v. Flanagan,
679 F.2d 1072 (3d Cir. 1982) ........................................................2, 13, 25, 29

United States v. Gambino,
864 F.2d 1064 (2d Cir. 1988) .................................................................16, 17

United States v. Gonzalez-Lopez,
548 U.S. 140 (2006)................................................................................9, 34

United States v. Hawkins,
No. CRIM.A 04-370-05,
2004 WL 2102017 (E.D.Pa. Aug. 26, 2004)...........................................30, 31

United States v. Hudson,
7 Cranch 32, 34, 3 L.Ed. 259 (1812) ..........................................................36

United States v. Iorizzo,
786 F.2d 52 (2d Cir. 1986) .........................................................................33

United States v. Kliti,
156 F.3d 150 (2d Cir. 1998) .............................................................13, 14, 18

United States v. Leaver,
358 F.Supp.2d 273 (SDNY 2005) ...............................................................35

United States v. Lebed,
No. CRIM.A. 05-362-01, CRIM.A. 05-362-02,
2005 WL 1971877 (E.D.Pa. Aug. 12, 2005).....................................29, 30, 31

United States v. Luciano,
158 F.3d 655 (2d Cir. 1998) .......................................................................11

United States v. Lussier,
71 F.3d 456 (2d Cir. 1995) .........................................................................11

United States v. Malpiedi,
62 F.3d 465 (2d Cir. 1995) .........................................................................33

United States v. Moscony,
927 F.2d 742 (3d Cir. 1991) ...............................................16, 17, 18, 29, 31

United States v. Perez,
325 F.3d 115 (2d Cir. 2003) ........................................................................33

United States v. Redd,
355 F.3d 866 (5th Cir. 2003) .......................................................................35

United States v. Reeves,
Criminal No. 11-520 (JBS),
2011 WL 6028000 (D.NJ Dec. 2, 2011) ...........................................1, 29, 32

United States v. Schwartz,
283 F.3d 76 (2d Cir. 2002) .........................................................................11

United States v. Stewart,
185 F.3d 112 (3d Cir. 1999) .......................................................................31

United States v. Vigil,
Docket No. 10 Cr. 2310 (JB),
2013 WL 3270995 (D.NM June 3, 2013)...................................................35

United States v. Voigt,
89 F.3d 1050 (3d Cir. 1996) ..................................................1, 2, 10, 13, 29

Wainwright v. Sykes,
433 U.S. 72 (1977)......................................................................................22

Wheat v. United States,
486 U.S. 153 (1988)......................................................1, 10, 13, 17, 20, 29

Wood v. Georgia,
450 U.S. 261 (1981).....................................................................................9

Woodson v. North Carolina,
428 U.S. 280 (1976)....................................................................................35

STATE CASES

In re Milita,
99 N.J. 336 (NJ 1985).................................................................................26

In re Supreme Court Advisory Committee on Professional Ethics
Opinion No. 697,
188 N.J. 549 (NJ 2006)....................................................................27

State v. Bruno,
323 N.J. Super. 322 (NJ Superior Ct. 1999)...................................28

State v. Chambliss,
128 Ohio St. 3d 507 (Ohio 2011) ..................................................34

State v. Galati,
64 N.J. 572 (NJ 1974)....................................................................26

State v. Hudson,
Docket No. A-2943-14T4,
2015 WL 9263744 (NJ App. Div. Dec. 21, 2015) ...........................26, 27, 29

STATUTES AND OTHER AUTHORITIES

28 U.S.C. § 528.............................................................................20

28 U.S.C. § 1292...........................................................................35

Fed.R.Crim.P. 44 .........................................................14, 31, 32, 33

NJ Rule of Prof. Conduct 1.7 ........................................................27

NJ Rule of Prof. Conduct 1.8 ........................................................27

NJ Rule of Prof. Conduct 1.9 ........................................................27, 28

**Preliminary Statement**

Defendant Farad Roland, by and through counsel, submits the instant memorandum of law in opposition to the Government's motion to disqualify Thomas Ambrosio, Esq.  As will be discussed below, the Government's motion is grossly misplaced; based entirely on wonton speculation, devoid of any reference to the facts and circumstances of this case, and reliant upon a highly misleading, incomplete, and at times disingenuous discussion of the law.  Stated simply, the Government's motion should be rejected out-of-hand.

Before proceeding to a discussion of the facts or a more detailed analysis of the law, we note at the outset several principles that the Government has failed to explain.  First, there is no one-size-fits-all answer to questions of conflict.  Merely raising an allegation of conflict is not enough.  "A court must evaluate 'the facts and circumstances of each case' to determine whether the presumption in favor of a defendant's choice of counsel is overcome" by the purported conflict.  United States v. Reeves, Criminal No. 11-520 (JBS), 2011 WL 6028000, *8 (D.NJ Dec. 2, 2011), quoting, United States v. Voigt, 89 F.3d 1050, 1077 (3d Cir. 1996); see also Wheat v. United States, 486 U.S. 153, 164 (1988) (same).  This is because an allegation of conflict does not mean there *is* a conflict, be it actual or potential, and even if there is a potential conflict, this Court's evaluation does not end there.

1

The law in this Circuit is clear, the "Defendant's choice of counsel is not to be dealt with lightly or arbitrarily.  **That choice should not be interfered with in cases where potential conflicts of interest are highly speculative**."  United States v. Flanagan, 679 F.2d 1072, 1076 (3d Cir. 1982).

As such, since questions of conflict must be resolved upon "the facts and circumstances of each case," Voigt, 89 F.3d at 1077, and since the Government's brief is based in pure speculation that completely ignores all of the facts proffered by Mr. Ambrosio during the December 15, 2015 status conference, we will begin with a discussion of the facts, and then turn to each of the Government's highly speculative scenarios.

### NEITHER THE FACTS NOR THE LAW SUPPORT THE GOVERNMENT'S MOTION TO DISQUALIFY MR. AMBROSIO

### A.    The Relevant Facts

On March 21, 2014, Mr. Ambrosio was informed that he was going to be appointed to represent a potential witness (hereinafter, "CW") in relation to unidentified Federal case.  See Ambrosio Declaration, dated, December 28, 2015, at ¶ 5 (hereinafter cited as, "Ambrosio Decl.", and annexed hereto as, "Exhibit A").  At the time CW was a defendant in a pending State case in Union County and was represented by counsel, a NJ Public Defender named Jessica Lyons.  Id. at ¶¶ 6, 7. AUSA Robert Frazer called Mr. Ambrosio to explain Mr. Ambrosio's limited role: to explain to CW how Federal cooperation worked, including to review the Federal

2

cooperation agreement with CW and discuss its potential impact on CW's State sentence.  Id. at ¶ 8.

Outside of stating that CW was going to be used in a gang case, AUSA Frazer did not explain any facts to Mr. Ambrosio related to CW's State case, nor any specific facts related to the Federal case (or cases) to which CW would be cooperating.  Id. at ¶¶ 9-11.  AUSA Frazer also did not provide the name of any potential defendant to whom CW would be cooperating against, id. at ¶ 10, and as such Mr. Ambrosio had insufficient information to know yet whether CW would be cooperating in just one case or multiple cases, nor whether any of those cases might relate.  Indeed, although AUSA Frazer mentioned that CW would be cooperating in a gang case, AUSA Frazer did not state which gang, and Mr. Ambrosio had never heard of the South Side Cartel until September 2015 when he began his involvement with Mr. Roland's representation.  Id. at ¶¶ 9, 11, 38.

On March 24, 2014, Mr. Ambrosio received a call from AUSA Osmar Benvenuto, who explained that CW was going to be called to testify before a Grand Jury related to a case that AUSA Benvenuto was prosecuting.  Id. at ¶ 12.  Like AUSA Frazer before him, AUSA Benvenuto did not tell Mr. Ambrosio what CW would be testifying about, nor who he would be testifying against.  Id. at ¶¶ 13, 14.

On March 25, 2014, Mr. Ambrosio was appointed as CJA counsel for CW, whose status remained solely as a cooperating witness and who was not charged with

a Federal offense.  Id. at ¶ 15.  To the best of Mr. Ambrosio's recollection, CW was not present for Mr. Ambrosio's appointment, having not been produced.  Id. at ¶ 18. Later that day Mr. Ambrosio was briefly introduced to CW by AUSA Benvenuto, but no substantive conversations were had.  Id. at ¶ 18.

On March 26, 2014, Mr. Ambrosio met with CW for approximately one hour. Id. at ¶ 21.  This was the first and only time Mr. Ambrosio and CW spoke in private. Id. at ¶ 19.  During that time Mr. Ambrosio reviewed the specifics of CW's cooperation agreement and the effect it could have on his State sentence.  Id. at ¶ 22. At no time did they discuss the facts of the Federal case(s) in which CW would be testifying, nor the substance of his upcoming Grand Jury testimony.  Id. at ¶ 23.  Mr. Ambrosio asked CW if he had any questions about cooperation, or his own case, but CW had no questions and as such the conversation concluded.[1]  Id. at ¶ 24. Thereafter, CW signed his cooperation agreement, which was co-signed by Mr. Ambrosio, Ms. Lyon, and AUSA Benvenuto.  AUSA Frazer and AUSA Andrew Bruck were also listed on the cooperation agreement, and AUSA John Gay signed the agreement to indicate his approval as Deputy Chief of the Criminal Division.  It

---

[1]     The fact that CW had no questions for Mr. Ambrosio, and shared no confidences with him, should not be surprising.  As any defense attorney knows, it is extremely rare for a defendant (or in this case, witness) to reveal major confidences to an appointed attorney who the defendant (or witness) never met or heard of before, particularly in a meeting that lasted only an hour.  Such reality provides further support for the fact that Mr. Ambrosio was provided no confidential information that could now be used to divide his loyalty or harm CW.

was Mr. Ambrosio's understanding that Ms. Lyons remained CW's counsel and that his role was now complete.  Id. at ¶ 25.

As such, on April 22, 2014, Mr. Ambrosio spoke briefly to Ms. Lyon and AUSA Benvenuto to confirm that CW had testified before the Grand Jury, after which Mr. Ambrosio submitted his CJA voucher, marking it as FINAL, and believing that his role in the representation of CW was complete.  Id. at ¶¶ 27, 28.

With the exception of the brief introduction on March 25, 2014, the only time Mr. Ambrosio has ever met or spoken with CW was on March 26, 2014 – a meeting that lasted approximately one hour and was for the very limited role and purpose discussed above.  Id. at ¶¶ 18-19, 21-24.  Mr. Ambrosio has not seen or spoken to CW a single time since March 26, 2014, and, as far as he had been aware, was no longer CW's attorney *in any capacity*.  Id. at ¶¶ 19, 26, 29.

On August 25, 2015, Donna Newman, then trial counsel for Farad Roland, submitted a letter to chambers under seal, seeking the appointment of new counsel for Mr. Roland.  Richard Jasper and Michael K. Bachrach were already appointed as learned counsel and co-counsel, respectively, and as such Ms. Newman was seeking that new counsel be appointed to replace her as trial counsel.  On September 2, 2015, an ex parte conference was had by telephone between defense counsel and the Court, in which this Court agreed that Ms. Newman should be permitted to

withdraw as counsel.[2]  Later that day this Court informed Mr. Ambrosio that he would be appointed as trial counsel for Mr. Roland, pending confirmation from the Government that there was no conflict that could interfere with his appointment. Thereafter, the Government, specifically AUSA Robert Frazer, informed this Court that Mr. Ambrosio possessed no conflict that could interfere with his representation of Mr. Roland.

Mr. Ambrosio began work on the case immediately.  See Ambrosio Decl. at ¶¶ 33-35.  He was introduced to Mr. Roland on September 3, 2015, see id. at ¶ 33, and formally appointed as Mr. Roland's trial counsel at a status conference held on September 11, 2015.[3]  Importantly, at the time of Mr. Ambrosio's appointment, the Government's present counsel in this case, including specifically, AUSA Robert Frazer, raised no objection to Mr. Ambrosio's appointment.

During the three months since his appointment, Mr. Ambrosio has visited Mr. Roland often, including during the initial period of his appointment when Mr. Ambrosio was actively engaged in an unrelated trial in the Southern District of New

---

[2]  We respectfully submit that the reasons for Ms. Newman's withdrawal from this case are unrelated and irrelevant to the Government's motion to disqualify Mr. Ambrosio, and as such those proceedings should remain ex parte and under seal.  Such proceedings should also remain ex parte and under seal because they relate to privileged attorney/client communications.

[3]  The Government's Brief states that Mr. Ambrosio was appointed on September 17, 2015 (Gov't Brief at 2), presumably relying upon the date that his CJA-30 was issued.  The Government overlooks that the CJA-30 was issued nunc pro tunc to September 2, 2015.  See ecf #113 (CJA-30, listing nunc pro tunc date); see also ecf #110 (Minute Entry of 9/11/15 status conference).

York.  See Ambrosio Decl. at ¶ 35.  Visiting Mr. Roland even though he was engaged in trial, made a strong and positive impression on Mr. Roland and the entire defense team.  While on trial, learned counsel and co-counsel kept Mr. Ambrosio apprised of every strategic decision and development occurring in Mr. Roland's defense, and Mr. Ambrosio participated in those strategic decisions by email and telephone.

Not surprisingly, once off trial, Mr. Ambrosio was quickly and fully integrated into all aspects of the defense, developed a strong bond with Mr. Roland, and has garnered the respect and admiration of Mr. Roland and the entire defense team.  Stated bluntly, in three months Mr. Ambrosio has done something many attorneys are unable to do no matter how long they represent their client: gain the defendant's confidence and trust.  The importance of this simply cannot be overstated, particularly given the nature of these authorized death penalty proceedings.

Cognizant of all or most of the above, on or about December 11, 2015, AUSA Frazer informed this Court and Mr. Ambrosio – *both for the very first time* – that AUSA Frazer believed that Mr. Ambrosio possessed a conflict of interest that required Mr. Ambrosio's automatic withdrawal or disqualification from this case.[4] On December 15, 2015, a status conference was held to discuss the Government's

---

[4]     Upon information and belief, AUSA Frazer had yet to discuss the issue with United States Attorney Paul J. Fishman, and as such AUSA Frazer could not represent at the time whether the Government would file a motion to disqualify Mr. Ambrosio if Mr. Ambrosio did not withdraw.

belief that a conflict existed and the defense position that disqualification was not warranted.

There being no agreement between the parties, on December 18, 2015, the Government moved to disqualify Mr. Ambrosio raising highly speculative scenarios while alleging no facts that dispute the events described above (indeed, omitting the majority of the above discussion).

To be clear, the Government does not dispute: (1) that Mr. Ambrosio's role was limited; (2) that CW was also represented by another attorney; (3) that in relation to Mr. Ambrosio's prior representation of CW, the Government never informed Mr. Ambrosio of any facts underlying CW's cooperation and Grand Jury testimony; (4) that CW never informed Mr. Ambrosio of any facts underlying his cooperation and Grand Jury testimony; (5) that Ms. Lyon never informed Mr. Ambrosio of any facts underlying CW's cooperation and Grand Jury testimony; nor (6) that Mr. Ambrosio has had any involvement or contact with CW since Mr. Ambrosio submitted his FINAL voucher on April 22, 2014, or even, for that matter, since Mr. Ambrosio's single, one-hour, meeting with CW on March 26, 2014.

Finally, we note that Mr. Roland has expressed to defense counsel and other members of the defense team that he does not want Mr. Ambrosio to withdraw from this case and he is willing to waive Mr. Ambrosio's potential conflict, assuming a potential conflict even exists here, which we dispute.

8

**B.** **No conflict exists that warrants Mr. Ambrosio's disqualification**

The law related to conflicts of interest is well settled.  First and foremost, a defendant's Sixth Amendment right to be represented by counsel of choice is one that may not be ignored lightly.  See United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006) (wrongful denial of counsel of choice results in automatic reversal of conviction; concluding that such is "structural error" since the consequences of such are "necessarily unquantifiable and indeterminate") (citation omitted).  This is because:

> Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument.  And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial.  In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds," or indeed whether it proceeds at all.  Many counseled decisions … do not even concern the conduct of the trial at all.  Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an ultimate universe.

Gonzales-Lopez, 548 U.S. at 150, quoting, Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

Of course, the Sixth Amendment's right to counsel also includes "a correlative right to representation that is free from conflicts of interest," Wood v. Georgia, 450

U.S. 261, 271 (1981), particularly since a conflict of interest claim boils down to a claim of ineffective assistance of counsel resulting from counsel's divided loyalties, see Glasser v. United States, 315 U.S. 60, 70 (1942).  The question of conflict remains, however, a fact-specific determination, see, e.g., United States v. Voigt, supra, 89 F.3d 1050, 1077 (3d Cir. 1996); see also Wheat v. United States, supra, 486 U.S. 153, 164 (1988) (same), because not all conflicts are actual conflicts, and indeed even amongst potential conflicts not all potential conflicts warrant disqualification.

An actual conflict of interest occurs when the interests of counsel and the defendant "diverge with respect to a material factual or legal issue or course of action." Cuyler v. Sullivan, 446 U.S. 335, 356 n.3 (1980).  "[T]he critical inquiry is whether counsel 'actively represented conflicting interests.' " Government of the Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984), quoting, Cuyler, 446 U.S. at 350.   Actual conflicts of interest may warrant disqualification, but are also extremely rare.  See, e.g., Tueros v. Greiner, 343 F.3d 587, 594-98 (2d Cir. 2003) (no actual conflict where lawyer representing defendant subjectively, but falsely, believed she owed duty of confidentiality to potential defense witness who blurted out to her that he was a fugitive); Armienti v. United States, 313 F.3d 807, 810 (2d Cir. 2002) (attorney had no actual conflict where defendant unable to show, after a hearing, that attorney's alleged ties to organized crime family had any influence on

his performance, or that attorney was negatively affected by unrelated criminal investigation into his activities).

Notably, even if an *actual* conflict exists disqualification is not automatic. Prejudice to the defendant flowing from an *actual* conflict is presumed, <u>see</u> <u>Cuyler</u>, 446 U.S. at 350, but the presumption is subject to rebuttal, <u>see</u> <u>United States v. Luciano</u>, 158 F.3d 655, 661 (2d Cir. 1998) (actual conflict presumed but judgment affirmed because presumption of prejudice overcome); <u>see also</u> <u>Eisemann v. Herbert</u>, 401 F.3d 102, 110 (2d Cir. 2005) (no proven effect of joint representation on lawyer's performance where no evidence suggested that lawyer had to "forgot a plausible defense theory").

Mandatory disqualification is required when an actual conflict is discovered that "is so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation" once the actual conflict came to light. <u>United States v. Lussier</u>, 71 F.3d 456, 461 (2d Cir. 1995). Examples of *per se* conflicts requiring automatic disqualification are limited to where a defense attorney is not licensed to practice law or where he or she is implicated in the defendant's crimes. <u>See, e.g.</u>, <u>United States v. Schwartz</u>, 283 F.3d 76, 96 (2d Cir. 2002). Here, neither *per se* situation is present and it can hardly be said that the Government's speculative hypotheticals are so egregious that they rise to the level of *per se*, unrebuttable, conflict.

Here, at most, a *rebuttable* conflict might exist if Mr. Ambrosio "<u>actively</u> represented conflicting interests," <u>Government of the Virgin Islands v. Zepp</u>, <u>supra</u>, 748 F.2d 125, 135 (3d Cir. 1984), <u>quoting</u>, <u>Cuyler</u>, 446 U.S. at 350 (emphasis added), by being privy to CW's expected testimony in this case, or if Mr. Ambrosio somehow discussed Mr. Roland's defense with CW and advised CW how to prepare for cross-examination.  Neither of those scenarios, however, is present here.

In fact, to the extent that Mr. Ambrosio still "technically" represents CW – even though they have not spoken in nearly two years and Mr. Ambrosio has, since at least April 22, 2014, operated under the belief that he no longer represents CW – such "technicality" can be easily cured by this Court issuing a one-sentence order terminating Mr. Ambrosio's representation of CW and appointing new counsel to replace him.  Indeed, if Ms. Lyons still represents CW then the appointment of new counsel for CW to replace Mr. Ambrosio would not even be necessary.

As such, we respectfully submit that there is no actual conflict in Mr. Ambrosio's prior presentation of CW, nor Mr. Ambrosio's (purportedly) concurrent representation of Mr. Roland and CW.  Further, to the extent that "technically" Mr. Ambrosio might still represent them both, such can be easily cured, and is, nonetheless still not a disqualifiable conflict when viewed in the context of the facts and circumstances of this case.

Turning next to potential conflicts, obviously, even where no actual conflict is present there may still be a *potential* conflict of interest "if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998). Even in those circumstances, however, there must be some proof that a potential conflict outweighs the defendant's Sixth Amendment right to counsel of choice.

The Third Circuit has made clear, "[T]he court must have sufficient evidence before it to suggest that disqualification [is] appropriate," United States v. Voigt, supra, 89 F.3d 1050, 1077 (3d Cir. 1996), and the defendant's choice of counsel "should not be interfered with in cases where potential conflicts of interest are highly speculative," United States v. Flanagan, supra, 679 F.2d 1072, 1076 (3d Cir. 1982) (emphasis added), as is the case here. Indeed, when examining speculation, courts have long been concerned "that the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." Wheat, 486 U.S. at 163; such manufactured conflicts certainly cannot be condoned.

The first step in resolving whether a possible conflict – actual or merely potential – warrants disqualification is to ascertain the nature of the problem. As this Court has already correctly done, the District Court in a pretrial setting must "initiate an inquiry when it knows or reasonable should know of the possibility of a

13

conflict of interest." <u>Strouse v. Leonardo</u>, 928 F.2d 528, 555 (2d Cir. 1991); <u>see also</u> Fed.R.Crim.P. 44(c).  If this Court determines that there is no conflict at all, then no more needs to be resolved, no waivers are necessary, and the Government's motion to disqualify Mr. Ambrosio may be dismissed without further inquiry.  <u>See</u> <u>Kliti</u>, 156 F.3d at 155.

On the other hand, if this Court determines that there is an actual conflict, or at least a potential conflict, then a hearing, pursuant to Rule 44(c) of the Federal Rules of Criminal Procedure, will be required.  <u>See</u> discussion at Section D, <u>infra</u>. In such a situation, depending on what potential conflict is being considered by this Court, a separate, independent, counsel will need to be appointed for Mr. Roland, and possibly for CW as well.  The role of the independent counsel (or counsels) is to provide independent advice regarding whether Mr. Roland, and if necessary CW (depending on what the potential conflict still under consideration might be) should waive his right to object to Mr. Ambrosio's actual or potential conflict.  While such proceedings are not often necessary in this District, they have become commonplace in the Southern and Eastern Districts of New York – hence defense counsels' familiarity with the rules and procedures of what the Second Circuit refers to as a "<u>Curcio</u> hearing".  <u>See</u> discussion at Section D, <u>infra</u>.

Here, however, as will be further discussed below, no conflict exists that warrants Mr. Ambrosio's disqualification.  Without question there is *no conflict that requires his mandatory disqualification*, and to the extent that there is a potential conflict, the Government has failed to identify any facts that would outweigh Mr. Roland's right to counsel of choice.

### C.  <u>The Government's hypotheticals should be rejected out-of-hand.</u>

The Government offers an onslaught of highly speculative and shockingly attenuated hypotheticals to support its argument that Mr. Ambrosio should be disqualified.  Not one passes the straight-faced test.

First, "[t]he Government asserts that Mr. Ambrosio's representation of the witness is ongoing as the witness has yet to testify and would require representation regarding the cooperation agreement until the terms of that agreement has been fulfilled, <u>i.e.</u>, testifying truthfully at any and all proceedings, including grand jury and trial proceedings" (Gov't Brief at 1).  This argument wholly ignores that Mr. Ambrosio was not present at any of CWs proffer sessions, has never been provided any of CW's statements, nor been made aware of the substance of his testimony, as such he is not even in the position to ascertain whether CW is "testifying truthfully at any and all proceedings, including grand jury and trial proceedings."

The Government's argument also ignores that, as made clear during the December 15, 2015, status conference, Mr. Ambrosio has had absolutely no contact

with CW since his one-hour meeting with CW on March 26, 2014, and that for all intents and purposes Mr. Ambrosio has not been CW's attorney for nearly two years. See also Ambrosio Decl. at ¶¶ 19, 21, 26-29.  The Government also ignores that even this potential conflict, assuming it is even that, could be remedied simply by terminating Mr. Ambrosio as counsel for CW.

Indeed, the Government does not dispute that CW "was also represented by a state public defender [Jessica Lyons], who also signed the cooperation agreement" (Gov't Brief at 2, n.5), and the Government avoids commenting on whether Ms. Lyons (or any other defense attorney) participated in any of CW's proffer sessions, assisted CW with his Grand Jury testimony, or continues to represent CW in conjunction with this case or CW's State case for which his Federal cooperation was intended to be credited.  We respectfully submit that Ms. Lyons's prior (and/or continuing) representation of CW is further proof of the limited role Mr. Ambrosio has had with respect to CW's cooperation.

The Government relies upon United States v. Moscony, 927 F.2d 742 (3d Cir. 1991), to support its misguided conclusion that Mr. Ambrosio possesses "an actual" conflict that requires his automatic disqualification (see Gov't Brief at 3-7).  The Government's conclusion, however, is greatly misplaced.

First, although Moscony and another case cited by the Government, United States v. Gambino, 864 F.2d 1064 (2d Cir. 1988), both held that the "Sixth

Amendment guarantee of effective assistance of counsel includes … the right to the attorney's undivided loyalty free of conflict of interest," Moscony, 927 F.2d at 748; Gambino, 864 F.2d at 1069 (same), the Government ignores that the Third Circuit in both cases conducted a fact-specific inquiry before determining that disqualification was warranted.  Indeed, in Moscony, the Third Circuit stressed that "another right is [also] derived from the right to effective assistance of counsel," the right of defendants to have "a fair opportunity to secure counsel of his own choice," Moscony, 927 F.2d at 748, quoting, Powell v. Alabama, 287 U.S. 45, 53 (1932). Further,

> [t]he view is that a primary purpose of the Sixth Amendment is to grant a criminal defendant control over the conduct of his defense – as "it is he who suffers from the consequences if the defense fails," Faretta v. California, 422 U.S. 806, 820 [] (1975) – and "[a]n obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative." Wheat v. United States, 846 U.S. at 166 [] (Marshall, J., dissenting).  Thus, a presumptive right to counsel of one's choice has been recognized as arising out of the Sixth Amendment, see, e.g., Wheat v. United States, 846 U.S. at 159 [],  and, unless this presumption was somehow overcome, [the defendant] had the right to have [his counsel of choice] represent him.

Moscony, 927 F.2d at 748.

The Government also ignores that the reason disqualification was deemed appropriate in Moscony was not because disqualification is automatic, but because the court determined that the prior *clients'* (there were three) privilege over

17

attorney/client communications were infringed by, <u>inter alia</u>, Moscony's refusal "to cure the conflict of interest problem by offering to forego cross-examination" of the relevant witnesses by his attorney.  As the Third Circuit explained, "During the great part of the grand jury investigation phase of this case, from December of 1986 through approximately June 30, 1987, Moscony and [his principle co-conspirator] Cullen, together with other Moscony employees," including three who testified in the Grand Jury against Moscony and were then "expected to be called as witnesses at trial," "were all [continuing to be actively] represented by [the same attorney]." See Moscony, 927 F.2d at 747.  Thus, in Moscony, at least three witnesses and the defendant were all actively represented by the same attorney during the Grand Jury investigation.  There was also no indication that the attorney had co-counsel or took any steps to mitigate the conflict, and there was no dispute that the attorney was privy to privileged information relating to each of his prior clients.  See id.

Here, of course, Mr. Roland has multiple attorneys and the defense has already stated that CW's cross-examination will be undertaken by either Mr. Jasper or Mr. Bachrach, not Mr. Ambrosio.  Even more importantly, **there are no privileged communications that need protection** since CW never made any privileged statements to Mr. Ambrosio that relate to the facts of this case.  See Kliti, 156 F.3d at 155 (finding *no conflict* to exist where initial inquiry revealed that counsel did not

acquire any confidential information from witness that might have affected his ability to cross-examine witness and represent defendant).

The Government speculates that there is "the potential for [CW] to testify to something that Mr. Ambrosio believes is untruthful *based on prior privileged conversations* between Mr. Ambrosio and [CW]. Consequently, Mr. Ambrosio would be left in the untenable position of having to either suborn perjury or cross-examine his own client with conflicting information obtained through a privileged communication" (Gov't Brief at 10-11). This argument completely ignores Mr. Ambrosio's proffer during the December 15, 2015 status conference that CW made no privileged statements to him that relate to the instant case. See also Ambrosio Decl. at ¶¶ 36, 37. Thus, the Government's speculation fails from the start.

The Government also speculates that there is potential for *Mr. Ambrosio* "to be called as a witness for the Government should [CW's] credibility be challenged regarding his motives to testify, his understanding of the cooperation agreement, the timing of his signing the cooperation agreement, or the benefits he is to receive from the Government, all areas defense counsel typically explore when conducting cross-examination of a Government cooperator" (Gov't Brief at 11). While the Government is correct that those are typical areas of cross-examination, the suggestion that the Government might call Mr. Ambrosio as a rebuttal witness in response to such cross-examination is patently absurd.

Defense counsel cannot recall a single case in any of our careers where the Government has sought to call a cooperating witness's attorney to rebut the testimony of his or her client. The reasons for this absence is obvious: first, such testimony would be inadmissible since it would require the violation of attorney/client privilege (assuming communications existed in the first place relevant to the topic at hand); and second, such would constitute a clear example of the gamesmanship that courts have long sought to avoid: "that the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." Wheat, 486 U.S. at 163. Indeed, if the Government were permitted to call Mr. Ambrosio to testify in this manner, then by this same logic defense counsel could then call AUSA Frazer as a defense witness with regard to his communications with Mr. Ambrosio regarding CW's cooperation, or even with regard to AUSA Frazer's communications with CW regarding the scope and parameters of CW's cooperation agreement.

To that end, AUSA Frazer would have a better understanding than Mr. Ambrosio of what assurances the Government has given to CW, since AUSA Frazer was present for proffer sessions whereas Mr. Ambrosio was not. Thus, if Mr. Ambrosio is disqualified based upon this instance of the Government's speculation, then AUSA Frazer must be disqualified as well. See 28 U.S.C. § 528 ("The Attorney General shall promulgate rules and regulations which require the disqualification of

any officer or employee of the Department of Justice, including a United States attorney or a member of such attorney's staff, from participation in a particular investigation or prosecution if such participation may result in a personal, financial, or political conflict of interest, or the appearance there.").[5]

Shockingly, this is not the only argument made by the Government that strains credulity. "The Government submits that the Court should not allow any proffered waivers of the conflict of interest because of the *significant* potential – *and even likely* – hazards of allowing conflicting representation in this case" (Gov't Brief at 10) (emphasis added). The Government then proceeds with the convoluted claim that "Roland's consent to having Mr. Jasper, his learned counsel, substitute for Mr. Ambrosio, his trial counsel, during the cross-examination of [CW] is not absolute. Roland could withdraw his consent, and in the midst of trial, require that Mr. Ambrosio cross-examine [CW]" (id.).

First off, the decision of which attorney will cross-examine which witness is not one that is within the purview of the defendant's ultimate control. As the Supreme Court explained in Florida v. Nixon, 543 U.S. 175, 187 (2004):

> An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy. Strickland [v. Washington], 466 U.S. [668], 688 [(1984)].   That

---

[5]   We note that we have no intention to actually call AUSA Frazer as a witness in this case, just as we assume the Government has no intention to actually call Mr. Ambrosio.  We include this discussion merely to show the absurdity of the Government's speculation.

> obligation, however, does not require counsel to obtain the defendant's consent to "every tactical decision." Taylor v. Illinois, 484 U.S. 400, 417 [] (1988) (an attorney has authority to manage most aspects of the defense without obtaining his client's approval).... **A defendant ... has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."** Jones v. Barnes, 463 U.S. 745, 751 [] (1983); Wainwright v. Sykes, 433 U.S. 72, 93 n.1 [] (1977) (Burger, C.J., concurring).

(Emphasis added.)   Concerning *only* those decisions must an attorney "both consult with the defendant and obtain consent to the recommend course of action." Nixon, 543 U.S. at 187.

Indeed, counsel could make the strategic decision not to conduct any cross-examination *at all* of CW (or any other guilt/innocence phase witness) and the defendant would have no redress under the Sixth Amendment. See, generally, Nixon, 543 U.S. 175 (holding that defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt at the guilt/innocence phase of an *authorized* death penalty trial did not automatically render counsel's performance deficient). Thus, the Government's claim here that Mr. Roland could "force the court to declare a mistrial" by withdrawing consent predicated upon a non-existent right displays a complete lack of understanding of attorney/client relationships in general and as applied to this case.

The Government also speculates that "it is possible that the defense would wish to call [CW] as a defense witness at trial," and that "Mr. Ambrosio's further

22

representation of Roland could influence or limit the defense's ability to call this potential witness on the defense case, or even investigate his background to make such a determination" (Gov't Brief at 11).  The Government then adds in a footnote that, "Because [CW's] identity is being protected, the Government could offer additional information to the court either *ex parte* or with Mr. Ambrosio present without learned counsel [and, presumably, without co-counsel] as to why [CW] may be a potential defense witness" (Gov't Brief at 11 n.7).

The Government's arguments here are particularly troubling.    The Government was required to disclose all Brady information by November 16, 2015. It appears from this discussion and footnote, however, that information "favorable to the defense" (i.e., Brady material) has been withheld.  See Kyles v. Whitley, 514 U.S. 419, 432 (1995) (suppression by prosecution of "evidence favorable to a defendant" violates Due Process where evidence is material either to guilt or punishment, irrespective of good faith or bad faith of prosecution).  If such is the case, the Government should be directed to immediately disclose this information to all defense counsel without any additional delay.  The Government should also be directed to immediately disclose any additional Brady material that also remains outstanding.  See also Kyles, 514 U.S. at 437-440 ("individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf," and the prosecutor remains responsible for duty under Brady to disclose

favorable evidence to defendant, regardless of whether police investigators failed to inform prosecutor of the existence of the favorable evidence); United States v. Agurs, 427 U.S. 97, 108 (1976) ("the prudent prosecutor will resolve doubtful questions in favor of disclosure").

Relatedly, the Government should not be permitted to manufacture a conflict by offering speculation relating to a subject area that the Government has insisted on keeping under seal. We respectfully submit that the time has come for CW's identity to be disclosed to *all* of Mr. Roland's attorneys, not simply Mr. Ambrosio, particularly if the protection of his name has been designed to keep favorable information from *any* of Mr. Roland's defense attorneys (or for that matter, any member of the defense team).[6]   Indeed, the Government should also be directed to disclose the identity of all Brady witnesses known to the Government, including, each Brady witness referenced (but not named) in the Government's November 16, 2015 letter. Without being informed of the identities of the Brady witnesses, the defense is unable to conduct a meaningful investigation into the favorable information disclosed by the Government.

The Government next speculates that "Mr. Ambrosio might be reluctant to treat [CW] as a hostile witness (for fear of revealing attorney-client communication,

---

[6]     As we have stated in the past, we remain willing to receive the names of cooperating witnesses subject to whatever reasonable protective order this Court believes appropriate.

jeopardizing his cooperation, or out of divided loyalties) or may fail to fully explore a defense strategy that Roland has specifically requested" (Gov't Brief at 11-12).  As previously discussed, Mr. Ambrosio's loyalties are not divided, his representation of CW was limited, and did not result in him learning any confidences related to CW's credibility or the Government's prosecution of this case.  As such, nothing Mr. Ambrosio learned during his prior representation of CW could jeopardize CW's cooperation, have the potential of revealing attorney/client communications, or divide his loyalties in some unexpected fashion.  Indeed, this is yet another "highly speculative" hypothetical that cannot be relied upon to justify Mr. Ambrosio's disqualification or trump Mr. Roland's Sixth Amendment right to counsel of choice. See United States v. Flanagan, supra, 679 F.2d 1072, 1076 (3d Cir. 1982).

The Government's highly speculative arguments also rely upon a too-strict interpretation of the New Jersey Rules of Professional Conduct.  Stated another way, we do not dispute the language of the NJ Rules, but we do dispute the manner in which the Government asserts that those rules are applied.

As previously stated, the Government ignores that each case cited by both parties proceed upon the understanding that conflict of interest determinations are made on an individual basis based upon "the facts and circumstances of the case", not the rout application of any one-size-fits-all rule.  A perfect example of this can be seen in a recent decision of Appellate Division of the State of New Jersey.  See

25

State v. Hudson, Docket No. A-2943-14T4, 2015 WL 9263744 (NJ App. Div. Dec. 21, 2015), decided just last week.

In Hudson, the defendant, who was a police officer, had been indicted for aggravated assault, weapons offenses, and official misconduct arising from a road rage incident. The trial court, upon the prosecutor's motion, disqualified defense counsel because he was also counsel for the police union and had represented another police officer in a prior disciplinary proceeding. On appeal, however, the Appellate Division reversed finding: (1) an appearance of impropriety could not be used to find a disqualifying conflict of interest; and (2) trial counsel's factual findings were insufficient to support its determination of actual conflict of interest.

At the outset the Appellate Division noted that, "The burden rests with the State to demonstrate a disqualifying conflict exists." Hudson, 2015 WL 9263744, at *3. The Appellate Division then turned to the history of Rules 1.7 and 1.9 of the NJ Rules of Professional Conduct, to examine the extent to which speculation could be relied upon in determining whether a conflict of interest existed: "For three decades … the Court, when examining cases of dual representation, steadfastly emphasized counsel clearly must avoid impropriety and insisted ' 'even the appearance of impropriety' that casts doubt upon the integrity of the criminal process must be avoided.' " Hudson, 2015 WL 9263744, at *6, quoting, In re Milita, 99 N.J. 336, 343 (NJ 1985) (in turn quoting, State v. Galati, 64 N.J. 572, 576 [NJ 1974]).

26

"A sea change occurred[, however,] in 2004, when the RPC's were amended to eliminate the 'appearance of impropriety' provisions from all RPCs, including PRC 1.7(c) and RPC 1.9(c)." Hudson, 2015 WL 9263744, at *7 (citations omitted).  This was followed, in 2006, by the New Jersey Supreme Court's decision to "declare[] the use of the appearance of impropriety doctrine moribund by stating: '[W]e hold that the 'appearance of impropriety' standard no longer retains any continued validity in respect of attorney discipline.' " Hudson, 2015 WL 9263744, at *7, citing, In re Supreme Court Advisory Committee on Professional Ethics Opinion No. 697, 188 N.J. 549, 568 (NJ 2006).

As a result, speculation, which is embodied in the "doctrine" of "appearance of impropriety," "is not a factor to be considered in determining whether a prohibited conflict of interest exists under RPC 1.7, 1.8, or 1.9 as its use 'injects an unneeded element of confusion." Hudson, 2015 WL 9263744, at *7, citing, Professional Ethics Opinion No. 697, 188 N.J. at 562 n.5; see also Hudson, 2015 WL 9263744, at *7 ("the amorphous and impractical appearance of impropriety doctrine may not serve as a basis to disqualify counsel because of a perceived conflict of interest").

The Appellate Division then turned to the specific facts and circumstances of the case to conclude that no actual or potential conflict existed that warranted disqualification of counsel.  The court's analysis is directly on point and particularly instructive here:

27

First, we agree with defendant that [the prior client] is not a key or essential State witness based on his disclosed involvement…. The facts strongly suggest that [the prior client's] role in the State's case was merely tangential[, and] it would be improper for the State to seek disqualification merely as a strategic maneuver.

Second, the absence of a certification from [the prior client] speaks volumes.  His silence along with [the attorney's] inability to recall the nature of the prior matter creates a void; no facts show an actual conflict exists based on [the attorney's] prior representation.  All we are told is [the attorney] represented [the prior client] in a disciplinary matter when he was a patrolman more than ten years ago.  The age of the prior matter and that [the prior client] has not engaged [the attorney] since do not support a current relationship.  Rather the facts show the attorney-client relationship ended many years ago.

Third, the nature of the prior representation must be examined.  Prior representation, in and of itself, is not sufficient to justify disqualification.  See [State v. Bruno, 323 N.J. Super. 322, 338 (NJ Superior Ct. 1999)]…. The absence of factual underpinnings describing the prior representation makes it impossible to determine whether [the attorney's role] created "a significant risk" that his representation of defendant "will be materially limited" due to responsibilities owed to [the prior client] under RPC 1.9(c)(2), or whether [the attorney] obtained knowledge from [the prior client] which might aid defendant that he would be prohibited from utilizing.  RPC 1.9(c)(1).  The assumption [the attorney's] prior representation would limit cross-examination because of ethical proscriptions against "reveal[ing] information relating to representation" or the "use [of] information relating to the representation to the disadvantage of the former client" are unfounded.  RPC 1.9.  The prior relationship may well have revealed no relevant information with the potential to undermine [the prior client's] testimony.

Hudson, 2015 WL 9263744, at *8.

Numerous other cases also support Mr. Roland's position that the Government's motion to disqualify Mr. Ambrosio should be denied.  For example, in United States v. Reeves, supra, 2011 WL 6028000, *8 (D.NJ Dec. 2, 2011), Judge Simandle denied the Government's motion to disqualify an attorney, Edwin Jacobs, who had represented a co-defendant, "for a brief two month period of time during which not much of consequence occurred in that representation.  [The attorney] claims that minimal if any confidential communication was exchanged to [the attorney] from the [prior client] and [as a result] there is no conflict of interest problem."  Judge Simandle thoroughly examined Voigt, Flanagan, Wheat, Moscony, and other of the cases cited by the Government here, to conclude:

> The court will deny the government's motion to disqualify Mr. Jacobs.  First, the court recognizes the presumption in favor of [the defendant's] choice of counsel.  The presumption was not outweighed by a serious potential for a conflict of interest.  The government's concerns were not substantiated by evidence and were based on generalizations and speculation.  This is insufficient to displace a defendant's right to counsel of his choice which is protected by the Sixth Amendment, and consented thereto by [the prior client] with the assistance of new counsel, as well as by [the defendant].

Reeves, 2011 WL 6028000, *16; see also United States v. Lebed, No. CRIM.A. 05-362-01, CRIM.A. 05-362-02, 2005 WL 1971877 (E.D.Pa. Aug. 12, 2005) (requiring each defendant to have separate counsel, but denying the Government's motion

disqualify a specific attorney notwithstanding his prior representation of multiple Government witnesses during the Grand Jury investigation and in parallel administrative proceedings); United States v. Hawkins, No. CRIM.A 04-370-05, 2004 WL 2102017, *8 (E.D.Pa. Aug. 26, 2004) (denying Government motion to disqualify defense counsel, holding that "the potential conflict between [the attorney's] previous representation of a government witness during the grand jury proceedings and his current representation of [the defendant] is not significant enough to overcome [the defendant's] right to choose his own counsel as provided by the Sixth Amendment").

While Lebed and Hawkins were decided in the Eastern District of Pennsylvania, not the District of New Jersey, they both were controlled by Third Circuit precedent and both present nearly the identical situation as presented here: the "potential" conflict between representing a witness in relation to Grand Jury proceedings thereafter followed by representing the target of those proceedings at trial. Here, the facts are even more favorable to the defense since Mr. Ambrosio only represented CW for purposes of the execution of CW's cooperation agreement, which preceded CW's Grand Jury testimony, but did not represent CW in relation to such subsequent testimony (Ms. Lyons served that role).

Additionally, in Hawkins the court emphasized that the existence of co-counsel further mitigated against any potential for conflict. See Hawkins, 2004 WL

2102017, *8 ("the fact that co-counsel … will, with the clear consent of [the defendant], not be privy to any confidences given by [the prior client] to [the attorney], but will himself cross-examine [the prior client], is an additional reason to allow [the attorney] to represent [the defendant]").  Similarly, in <u>Lebed</u>, the District followed, <u>inter alia</u>, <u>Hawkins</u> to rule that no conflict existed that warranted disqualification, and to ensure against the potential for conflict directed that cross-examination of the prior witness be performed by the attorney's co-counsel.  <u>See Lebed</u>, 2005 WL 1971877, at *6 (noting that the use of co-counsel to cross-examine the attorney's prior clients, "avoids potentially placing [the attorney] in the Catch-22 position described in <u>Stewart</u> and <u>Moscony</u> of either depriving his client of his or her Sixth Amendment right to effective assistance of counsel by constraining his questioning of [the prior clients], or cross examining a prior client."); <u>see also</u> <u>id.</u> (explaining that disqualification was also unnecessary because, "[u]nlike <u>Moscony</u>, where an extensive previous attorney-client relationship existed between several important government witnesses and the defendant's lawyer," Lebed's defense counsel's "involvement as attorney for [the prior witnesses] is here found to be minimal and brief").

### D.  The procedure to follow if this Court believes a waiver would assist the instant proceedings.

In cases of joint representation, Rule 44(c) of the Federal Rules of Criminal Procedure requires the Court to "to promptly inquire about the propriety of joint

31

representation and … personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Rule 44(c) also provides, "*Unless there is good cause to believe that no conflict of interest is likely to arise*, the court must take the appropriate measures to protect each defendant's right to counsel" (emphasis added). Courts in this District and others apply the requirements of Rule 44(c) not merely to joint representation of co-defendants, but to questions related to prior or concurrent representation of witnesses as well. See, e.g., United States v. Reeves, supra, 2011 WL 6028000 (D.NJ 2011).

While we believe "good cause" does not exist to conclude that a "conflict of interest is likely to arise," should this Court determine that a Rule 44(c) hearing would assist the instant proceedings, or, more specifically, that a waiver of the purported conflict would protect "defendant's right to counsel", we respectfully submit that the 6-part procedure well-traveled by the Second Circuit provides helpful guidance here:

> [Prior to obtaining a waiver,] the trial court (1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risks of representation by his present counsel and freely chooses to run them.

United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003), citing, United States v. Curcio, 680 F.2d 881, 888-90 (2d Cir. 1982); cf. United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir. 1995) (District Court's after-the-fact inquiry into whether defendant was satisfied with conflicted counsel's cross-examination invalid under Curcio); United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir. 1986) (defective Curcio procedure where, among other things, it was conducted by conflicted counsel rather than by the court, and defendant was forced to make a decision "on the spot").

We suggest that this Court follow the guidance of the Second Circuit in this instance because we know of no Third Circuit case that so clearly articulates the procedures of a Rule 44(c) hearing, and because conflict hearings appear to occur considerably more often in the Second Circuit than in the Third Circuit (indeed, Curcio hearings are routine and common practice in the Southern and Eastern Districts of New York).

### E.    The appropriateness of an interlocutory appeal irrespective of the outcome of the instant motion.

At the outset we note that during the December 15, 2015, status conference in this case defense counsel were unaware that in 1984 the Supreme Court held that the defendant had no automatic right to an interlocutory appeal of the decision to disqualify counsel.  See Flanagan v. United States, 465 U.S. 259 (1984).  We had overlooked that case because more recent case law calls the continued viability of

Flanagan into doubt.  See, e.g., State v. Chambliss, 128 Ohio St. 3d 507 (Ohio 2011) (examining Supreme Court's more recent decisions in United States v. Gonzalez-Lopez, supra, 548 U.S. 140, 150 [2006], Sullivan v. Louisiana, 508 U.S. 275, 282 [1993], and Arizona v. Fulminante, 499 U.S. 279, 310 [1991], to conclude that Flanagan is no longer good law and that a pretrial ruling removing a criminal defendant's counsel of choice is a final order subject to immediate appeal); see also Section B, supra (discussing, inter alia, Gonzalez-Lopez and Arizona v. Fulminante).

As previously discussed, in Gonzalez-Lopez, decided 22 years after Flanagan, the United States Supreme Court held that the "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" Gonzalez-Lopez, 548 U.S. at 150, quoting, Sullivan, 508 U.S. at 282.  The Supreme Court reached this decision because different attorneys will pursue different strategies with regard to all aspects of the case, none of which is effectively reviewable after trial, and as a result "[h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an ultimate universe." Gonzales-Lopez, 548 U.S. at 150, quoting, Fulminante, 499 U.S. at 310.

Here, as well, this is a death penalty case, and as such different rules and considerations apply.  In an ordinary case, for example, the only concern is that an erroneous disqualification of counsel might result in a conviction, here, however,

there is the possibility that Mr. Roland's life literally hangs in the balance since an erroneous disqualification of Mr. Ambrosio could result in Mr. Roland's *execution*. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976) ("The penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."); see also Gardner v. Florida, 430 U.S. 339, 357-58 (1977) ("[D]eath is a different kind of punishment from any other which may be imposed in this country.  From the point of view of the defendant, it is different in both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action.").

The Government notes that that 28 U.S.C. § 1292(b) only applies to civil actions, and thus it posits that certification is not permissible (see Gov't Brief at 13). However, there is no Federal statute that specifically prohibits this Court from certifying an appeal in a criminal case.  Moreover, when no analogous criminal rule exists to address the issue one way or the other, the analogous civil rule applies.  See, e.g., United States v. Leaver, 358 F.Supp.2d 273, 277 n.14 (SDNY 2005); United States v. Vigil, Docket No. 10 Cr. 2310 (JB), 2013 WL 3270995, at *10 (D.NM June 3, 2013), citing, Black v. United States, 561 U.S. 465, 130 S.Ct. 2963, 2969 (2010), United States v. Redd, 355 F.3d 866, 874 (5th Cir. 2003).

Finally, the Government points to no case, and defense counsel knows of none, that prohibits this Court from certifying an appeal if this Court determines that it is in the interests of justice to do so.  As such, irrespective of whether the parties possess an automatic right to appeal the present motion, we respectfully submit this Court can bestow that right through the exercise of its discretion.  See Degen v. United States, 517 U.S. 820 (1996) ("Courts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."), citing, Chambers v. NASCO, Inc., 501 U.S. 32, 43-46 (1991), Link v. Wabash R. Co., 370 U.S. 626, 630-631 (1962), United States v. Hudson, 7 Cranch 32, 34, 3 L.Ed. 259 (1812).

## Conclusion

The Government's attempt to manufacture a conflict where one does not exist, cannot be condoned.  To that end, we respectfully submit that the Government's highly speculative motion must be denied.  As the above discussion makes clear, not all conflicts are the same.  Some require disqualification.  Some do not.  And others, like here, upon close inspection are not conflicts at all.  We respectfully submit that regardless whether this Court determines that an actual conflict, a potential conflict, or no conflict, exists, the facts and circumstances of this case make clear that Mr.

Ambrosio's disqualification from representing Defendant Farad Roland is not remotely warranted.

Moreover, to the extent this Court deems necessary, and in the event that Mr. Ambrosio's representation of CW has not already "technically" ceased, Mr. Ambrosio asks that this Court immediately formally-terminate his representation of CW in order to avoid *even the mere appearance* of potential conflict.

Accordingly, for all of the reasons expressed previously and herein, Defendant Farad Roland, by and through counsel, respectfully submits that the Government's motion to disqualify Mr. Ambrosio from representing Mr. Roland in this case should be denied.  We further submit that irrespective of the outcome of the Government's motion, this Court should certify an appeal in light of the nature of this case, the potential consequences either side will face based upon this Court's decision, and in the interests of justice to ensure that an authorized death penalty trial, estimated by the Government to last up to seven months, does not proceed in vain.

Dated:  New York, New York
December 28, 2015

Respectfully submitted,

/S/ Michael K. Bachrach
/S/ Richard Jasper
/S/ Thomas Ambrosio
*Attorneys for Defendant Farad Roland*