|  | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>FARAD ROLAND,<br>    Defendant. | Hon. Esther Salas<br><br>Criminal No. 12-298 (S-2)(ES) |

---

## BRIEF *AMICUS CURIAE* OF MICHAEL J. ZYDNEY MANNHEIMER

---

RIKER DANZIG SCHERER HYLAND &
 PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for *Amicus Curiae*,
Michael J. Zydney Mannheimer

Of Counsel:
 Zahid N. Quraishi, Esq.

On the Brief:
 Michael J. Zydney Mannheimer
 Professor of Law
 Associate Dean for Faculty Development
 Salmon P. Chase College of Law

## TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF *AMICUS CURIAE* .....................................1

SUMMARY OF ARGUMENT ..............................................................................2

ARGUMENT...........................................................................................................3

      THE IMPOSITION OF THE DEATH PENALTY FOR CRIMES COMMITTED IN NEW JERSEY, WHICH DOES NOT AUTHORIZE CAPITAL PUNISHMENT, CONSTITUTES "CRUEL AND UNUSUAL PUNISHMENT" IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION......................................................................3

CONCLUSION .....................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Benner* v. *Oswald*,
  592 F.2d 174 (3d Cir. 1979) ............................................................... 13

*Bond* v. *United States*,
  564 U.S. 2111 (2011) ............................................................................ 3

*Furman* v. *Georgia*,
  408 U.S. 238 (1972) (per curiam) ...................................................... 13

*Glossip* v. *Gross*,
  135 S.Ct. 2726 (2015) (Thomas, J., concurring) ............................ 14

*Gonzales* v. *Raich*,
  545 U.S. 1 (2005) .................................................................................. 4

*Hodel v Indiana*,
  452 U.S. 315 (1981) ............................................................................ 13

Luis v. United States,
  136 S.Ct. 1083 (2016) (Thomas, J., concurring in the judgment) ............................ 17

*Obergefell* v. *Hodges*,
  135 S.Ct. 2584 (2015) ........................................................................ 12

*Phillips* v. *Washington Legal Found.*,
  524 U.S. 156 (1998) ............................................................................ 11

*Sable Comms. of Cal., Inc.* v. *FCC*,
  492 U.S. 115 (1989) ............................................................................ 11

*Tucker* v. *Louisiana*,
  136 S.Ct. 1801  (2016) (Breyer, J., dissenting from denial of certiorari) .................. 14

*United States* v. *Sharpnack*,
  355 U.S. 286 (1958) ............................................................................ 13

*United States* v. *Vallie*,
284 F.3d 917 (8th Cir. 2002) ................................................................. 13

*United States* v. *Windsor*,
133 S.Ct. 2675 (2013) ............................................................................. 12

*United States* v. *Worrall*,
2 Dall. (2 U.S.) 384 (C.C.D. Pa. 1798) (Chase, J.) ....................................... 8

*United States* v. *Yazzie*,
693 F.2d 102 (9th Cir. 1982) ................................................................ 13

*Wiggins* v. *Smith*,
539 U.S. 510 (2003) ............................................................................... 12

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Amend. VIII .................................................................passim

**STATUTES**

Assimilative Crimes Act,18 U.S.C. § 13(a) ..................................................... 13

Major Crimes Act, 18 U.S.C. § 1153 ............................................................ 13

National Bank Robbery Act of 1934, 18 U.S.C. § 2113(e) ................................... 2

**RULES**

FED. R. APP. P. 29 ................................................................................... 1

**OTHER AUTHORITIES**

24 JOURNALS OF THE CONTINENTAL CONGRESS
(Gaillard Hunt ed., 1922) ........................................................................ 8

2 THE COMPLETE ANTI-FEDERALIST 164 (Herbert J. Storing ed. 1981) ................... 4, 6

Aaron J. Veselenak, "Making Legal History – The Execution of Anthony
Chebatoris," *The Court Legacy*, Vol. VI, No. 2 (Fall 1998) ............................ 2

Arthur E. Wilmarth, Jr., *Workable Balance Between Federal and State Power*,
26 AM. CRIM. L. REV. 1261 (1989) ............................................................ 5

Calvin Massey, *The Anti-Federalist Ninth Amendment and Its Implications for State Constitutional Law*, 1990 WIS. L. REV. 1229 ........................................................... 5

Henry P. Monaghan, *Supremacy Clause Textualism*, 110 COLUM. L. REV. 731 (2010) ........................................................................................................... 8

John Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation* (2008) ........................................................................ 7

Laurence Claus, *The Antidiscrimination Eighth Amendment*, 28 HARV. J. L. & PUB. POL'Y 119 (2004) .......................................................................................... 7

Michael J.Z. Mannheimer, *Cruel and Unusual Federal Punishments*, 98 IOWA L. REV. 69 (2012) .................................................................................... 8, 9, 10

Michael J.Z. Mannheimer, *The Contingent Fourth Amendment*, 64 EMORY L.J. 1229 (2015) ................................................................................... 1, 7, 9

Michael J.Z. Mannheimer, Harmelin*'s Faulty Originalism*, 14 NEV. L.J. 522 (2014) ................................................................................................................ 1

Michael J.Z. Mannheimer, *Proportionality and Federalism: A Response to Professor Stinneford*, 97 VA. L. REV. IN BRIEF 51 (2011). ............................... 1, 8

Michael J.Z. Mannheimer, *Self-Government, the Federal Death Penalty, and the Unusual Case of Michael Jacques*, 36 VT. L. REV. 131 (2011) ............................ 1

Michael J.Z. Mannheimer, *When the Federal Death Penalty Is "Cruel and Unusual,"* 74 U. CIN. L. REV. 819 (2006) ........................................................... 1

Robert A. Rutland, *Framing and Ratifying the First Ten Amendments*, in THE FRAMING AND RATIFICATION OF THE CONSTITUTION 305, 305 (L. Levy & D. Mahoney eds.1987) .......................................................................... 6

Robert C. Palmer, *Liberties as Constitutional Provisions, 1776-1791*, in CONSTITUTION AND RIGHTS IN THE EARLY AMERICAN REPUBLIC 55, 105 (Robert C. Palmer & William E. Nelson eds. 1987) ........................................ 10

Robert J. Smith, *The Geography of the Death Penalty and Its Ramifications*, 92 B.U. L. REV. 227 (2012) ............................................................................... 14

SAUL A. CORNELL, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA (1999) ................................................ 5,6

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* Michael J. Zydney Mannheimer is Professor of Law and Associate Dean for Faculty Development at Salmon P. Chase College of Law, Northern Kentucky University,[2] where he teaches courses in, *inter alia*, criminal law and procedure, and the death penalty.  He was also Co-Chair of the Kentucky Death Penalty Assessment Team for the American Bar Association from July 2009 through January 2012.  *Amicus* has a particular scholarly interest in the original understanding of the Cruel and Unusual Punishments Clause of the Eighth Amendment, as demonstrated by his works:  *Cruel and Unusual Federal Punishments*, 98 IOWA L. REV. 69 (2012); Harmelin*'s Faulty Originalism*, 14 NEV. L.J. 522 (2014); *Proportionality and Federalism:  A Response to Professor Stinneford*, 97 VA. L. REV. IN BRIEF 51 (2011); *Self-Government, the Federal Death Penalty, and the Unusual Case of Michael Jacques*, 36 VT. L. REV. 131 (2011); and *When the Federal Death Penalty Is "Cruel and Unusual,"* 74 U. CIN. L. REV. 819 (2006).[3]  As a result of his research, *Amicus* believes that,

---

[1] This brief is submitted in accordance with FED. R. APP. P. 29.  No counsel for any party authored this brief in whole or in part, and no person or entity, other than the *Amicus Curiae* or counsel, made a monetary contribution to the preparation or submission of this brief.

[2] The views expressed herein are those of the individual *Amicus*, not of any institutions or groups with which he is affiliated.

[3]  Amicus's focus in his scholarship on the original understanding of the Bill of Rights is not limited to the Eighth Amendment.  *See generally* Michael J.Z. Mannheimer, *The Contingent Fourth Amendment*, 64 EMORY L.J. 1229 (2015) (arguing that Reasonableness Clause of Fourth Amendment was originally understood as requiring that federal officials abide by state search-and-seizure law in each respective State).

whatever else it might proscribe, the core, irreducible meaning of the Cruel and Unusual Punishments Clause is that the United States may not inflict upon an individual a punishment more severe than the harshest punishment authorized by the law of the State where the crime occurred. Because the crimes at issue here occurred in New Jersey, which does not authorize capital punishment for any crime, the federal government may not seek the death penalty against Mr. Roland.

## SUMMARY OF ARGUMENT

The United States has never – *ever* – executed someone for a crime committed in a State that absolutely forbids the death penalty. Only once has the United States inflicted the death penalty for a crime occurring in a State that does not authorize that punishment *for the same offense*.[4] And only since 2002 has a federal jury imposed the death penalty for a crime committed in a non-death-penalty State. *See* "Authorized Federal Capital Prosecutions Arising in Non-Death Penalty States," available at https://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=92&folder_id=6086 (last updated June 2016). There is good reason for this: as originally understood, the Cruel and Unusual Punishments Clause of the Eighth Amendment incorporated a federalism component by calibrating federal punishment authority to state norms, thus barring in

---

[4] In 1938, Anthony Chebatoris was executed for attempting to rob a bank in Midland, Michigan with death resulting, in violation of the National Bank Robbery Act of 1934, 18 U.S.C. § 2113(e). *See* Aaron J. Veselenak, "Making Legal History – The Execution of Anthony Chebatoris," *The Court Legacy*, Vol. VI, No. 2, pp. 7-10 (Fall 1998). Chebatoris did not make the argument presented here and he did not appeal. *See id* at 9. At the time, Michigan authorized capital punishment for treason but not for murder. *See id*

2

each respective State any punishment not practiced there.  New Jersey eliminated the death penalty in 2007.  *See* 2007 NJ Sess. Law Serv. Ch. 204 (Senate 171 and 2471). Capital punishment is thus harsher than the most severe punishment allowed by New Jersey law.  In the most fundamental, literal meaning of the words, the death penalty in New Jersey is "cruel and unusual."

### ARGUMENT

**THE IMPOSITION OF THE DEATH PENALTY FOR CRIMES COMMITTED IN NEW JERSEY, WHICH DOES NOT AUTHORIZE CAPITAL PUNISHMENT, CONSTITUTES "CRUEL AND UNUSUAL PUNISHMENT" IN VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION.**

The Eighth Amendment to the U.S. Constitution provides that "cruel and unusual punishments [shall not] be inflicted."  U.S. CONST., amend VIII.  In this federal prosecution, the Eighth Amendment applies directly, unmediated by the Fourteenth.  A full understanding of the Bill of Rights is impossible without looking to the motivations of the Anti-Federalists – those who initially opposed ratification of the Constitution – for it is they who demanded the Bill as the price of their reluctant acquiescence to union. The history behind the adoption of the Bill of Rights demonstrates a desire by the Anti-Federalists to preserve state sovereignty and state autonomy.  In particular, the criminal procedure protections of the Bill limited federal power in the criminal justice sphere, thereby preserving state power in that realm, by tying federal power to the norms of the respective States.  One of the few discrete areas that the Bill of Rights carves out for state

primacy is criminal punishment:  the Cruel and Unusual Punishments Clause sets the outer limits of the federal power to punish based on the constraints that individual States place on their own power to punish.  Where a punishment, such as the death penalty, is unauthorized by the laws of a State, it would constitute "cruel and unusual punishment" for the federal government to impose that punishment for a crime committed in that State.[5]

The Anti-Federalists predicted that the broad powers granted to the federal government would allow Congress to create a system of criminal law parallel to those of the States.[6]  They feared that such a parallel system of criminal law would effectively displace state criminal law.  This caused them great concern for two inter-related reasons. First, as leading Anti-Federalist Melancton Smith put it at the New York ratifying convention, they believed that the powers given to the federal government would cause "[t]he state governments [to] soon dwindle into insignificance."  Speech by Melancton Smith (June 25, 1788), reprinted in 2 THE COMPLETE ANTI-FEDERALIST 164, 166 (Herbert J. Storing ed. 1981) [hereinafter STORING].  Second, if federal criminal law were to displace state criminal law, the criminal procedure protections in state bills of rights

---

[5] Mr. Roland has standing to benefit from this claim.  The protections of our federal structure embedded in the Bill of Rights can be invoked by individuals harmed by the breach of those protections, even if the States themselves do not protest.  *See Bond* v. *United States*, 564 U.S. 211, 221-22 (2011).

[6] These predictions have, of course, come to fruition.  *See, e.g., Gonzales* v. *Raich*, 545 U.S. 1, 15-22 (2005) (construing Constitution to permit federal criminalization of intrastate possession of marijuana for personal use).

would be useless.  Thus, Virginia Anti-Federalist George Mason began his *Objections to the Constitution of Government formed by the Convention* (1787), *reprinted in 2 id.* at 13, by observing: "There is no Declaration of Rights; and the Laws of the general Government being paramount to the Laws and Constitutions of the several States, the Declaration of Rights in the separate States are no security."  These two fears were often expressed together, as by Pennsylvania Anti-Federalist Centinel, when he wrote that the federal government would "annihilate the particular [State] governments," leading to the destruction of individual rights because "the security of personal rights of the people by the state governments [would be] superseded."  Letter of Centinel to the People of Pennsylvania, reprinted in 2 *id.* at 143, 152.

Accordingly, the Anti-Federalists saw the Constitution as a threat to both State power and individual rights simultaneously.  Indeed, they viewed the two as inextricably intertwined.  *See* Akhil R. Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 128 (1998) (observing that, for Anti-Federalists, "substantive rights . . . were intimately intertwined with structural considerations"); Saul A. Cornell, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828, at 6 (1999) ("[S]tates' rights and individual rights were not antithetical in Anti-Federalist constitutionalism, but intimately bound together.").  And they considered the greatest protection for human liberty in the realm of criminal justice to be the constraints that the States placed on themselves.  *See* Calvin Massey, *The Anti-Federalist Ninth Amendment and Its Implications for State Constitutional Law,* 1990 WIS. L. REV. 1229, 1231 ; Arthur E.

<div align="center">5</div>

Wilmarth, Jr., *The Original Purpose of the Bill of Rights: James Madison and the Founders' Search for a Workable Balance Between Federal and State Power*, 26 AM. CRIM. L. REV. 1261, 1263 (1989). So they demanded that a Bill of Rights be added to the Constitution, which would, in large part, express the intertwined nature of individual rights and State sovereignty by tying the limits of federal power to state norms.

Nowhere is this more clear than in George Mason's explanation of the need for a provision preventing the federal government from imposing "unusual" punishments. In his *Objections*, Mason wrote:

> Under their own Construction of the general Clause at the End of the enumerated powers [i.e., the Necessary and Proper Clause] the Congress may grant Monopolies in Trade and Commerce, constitute new Crimes, *inflict unusual and severe Punishments*, and extend their Power as far as they shall think proper; so that the State Legislatures have no Security for the Powers now presumed to remain to them; or the People for their Rights.

2 STORING, *supra*, at 13 (emphasis added).[7] This passage is short but telling. First, it demonstrates the Anti-Federalist notion of the intertwined nature of state power and individual rights. Second, that Mason conjoined his concerns that Congress might create "new Crimes" and "inflict unusual and severe Punishments" tells us that the Anti-

---

[7] Mason's *Objections* are particularly significant because they were second only to those of Elbridge Gerry in their influence over the writings and speeches of other Anti-Federalists. *See* Saul A. Cornell, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828, at 29 (1999). Additionally, Mason's *Objections* were written even before the Constitution was signed, thus becoming "the first salvo in the paper war over ratification." Robert A. Rutland, *Framing and Ratifying the First Ten Amendments*, in THE FRAMING AND RATIFICATION OF THE CONSTITUTION 305, 305 (L. Levy & D. Mahoney eds. 1987).

Federalists feared the threat posed by the proposed federal government to the States' monopoly on criminal justice.

Perhaps most importantly, Mason's fear that "State Legislatures [will] have no Security for the Powers now presumed to remain to them," follows closely on the heels of his concern regarding three potential incursions on those powers by Congress under the new Constitution:  the "grant[ing of] Monopolies in Trade and Commerce," the creation of "new Crimes," and the "inflict[ion of] unusual and severe Punishments."  But surely Mason could not have meant that the State legislatures should retain the power, not only to create crimes and grant monopolies, but also to "inflict unusual and severe Punishments."  This passage could mean little else but that Mason believed that the State legislatures must be permitted to retain, among "the Powers [then] presumed to remain to them," the power to set the outer bounds of criminal punishment, and that the "unusual and severe Punishments" that he feared were those that were more severe than those authorized by the State legislatures.

This interpretation dovetails almost perfectly with the Anti-Federalists' more general objections to the Constitution.  The Anti-Federalists' overarching objection to the Constitution was that its grants of vast federal power would lead to the annihilation of the States as sovereign, autonomous entities.  Their overarching response was to demand a Bill of Rights.  That so much of the Bill of Rights addresses the federal criminal process demonstrates the Anti-Federalists' goal of ensuring "the continuing prerogative of the States to set their own parameters for crime and punishment."

Michael J.Z. Mannheimer, *Cruel and Unusual Federal Punishments*, 98 IOWA L. REV. 69, 105 (2012). The Anti-Federalists feared the return of a powerful central government using its criminal justice authority to punish dissenters. They sought with the Bill of Rights to minimize the role of the federal government in meting out criminal justice by making it more difficult for that government to investigate, prosecute, convict, and punish offenders. In that way, the federal government would be motivated in large part to stay out of the criminal justice arena, leaving such matters largely to the States. *See* George C. Thomas III, *When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure*, 100 MICH. L. REV. 145, 152-60 (2001).

Moreover, the Anti-Federalists most likely contemplated that what constituted "cruel and unusual punishments" would be determined on a State-by-State basis. There is a growing consensus among scholars in this field that the Cruel and Unusual Punishments Clause imposed a common-law type constraint on the federal government. That is to say, cruel and unusual punishments in 1791 were generally understood to be those unauthorized by the common law. *See* Laurence Claus, *The Antidiscrimination Eighth Amendment*, 28 HARV. J. L. & PUB. POL'Y 119, 136 (2004); John Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 NW. L. REV. 1739 (2008). Yet, at about the same time, a proto-Realist view of the common law was taking hold in legal thinking, a view that recognized the common law as "instrumental," not "declaratory." Henry P. Monaghan, *Supremacy Clause Textualism*, 110 COLUM. L. REV. 731, 774 (2010). According to this view, the common law differed in every State. *See, e.g.,*

*United States* v. *Worrall*, 2 Dall. (2 U.S.) 384, 394 (C.C.D. Pa. 1798) (Chase, J.). Moreover, the main proponents of this view were the moderate Anti-Federalists. Thus, the very same faction that was largely responsible for the Eighth Amendment also pressed the view that the common law differed by State. If the Cruel and Unusual Punishments Clause was thought to embody common-law constraints on the federal government's power to punish, and if the common law was thought to differ in every State, it follows that the constraints embodied in the Clause were also thought to vary by State. *See* Mannheimer, *Cruel and Unusual Federal Punishments*, *supra*, at 123-28; Michael J.Z. Mannheimer, *Proportionality and Federalism: A Response to Professor Stinneford*, 97 VA. L. REV. IN BRIEF 51, 54-60 (2011).

This jurisdiction-specific understanding of the term "cruel and unusual" is all but confirmed by language contained in several States' conditional ratifications of a proposed confederal impost regulation in the 1780s. In 1783, the Articles of Confederation Congress recommended that it be vested with the power to levy duties on certain imports, a recommendation that required unanimous consent of the States in order to become operative. 24 JOURNALS OF THE CONTINENTAL CONGRESS, 1774-1789, at 256–57 (Gaillard Hunt ed., 1922). In ratifying this proposed impost power, four of the thirteen States— Georgia, Massachusetts, New Hampshire, and South Carolina— made clear that they did so only on condition that punishments for customs violations never exceed that which could be imposed under state law. Each of these four States forbade the confederal Congress from "inflict[ing] punishments which are either cruel or unusual

9

*in this State*" (or in Massachusetts, "*in this commonwealth*").  THE RESOLUTIONS OF CONGRESS OF THE 18TH OF APRIL, 1783: RECOMMENDING THE STATES TO INVEST CONGRESS WITH THE POWER TO LEVY AN IMPOST, FOR THE USE OF THE STATES; AND THE LAWS OF THE RESPECTIVE STATES, PASSED IN PURSUANCE OF THE SAID RECOMMENDATION 7, 10, 44, 48 (New York, Carroll & Patterson 1787) (emphasis added).  Accordingly, less than a decade before the Cruel and Unusual Punishments Clause was adopted, language virtually identical to that used in the Clause was used to ensure that state punishments marked the outer boundary for punishment to be meted out by the central government.  The framers and ratifers of the Bill of Rights carried this proscription over to the new central government in 1791 by forbidding it from inflicting "cruel and unusual punishments."

Of course, one might question why we should consult the Anti-Federalists, who lost the battle to derail ratification of the Constitution.  But while the Constitution represents an Anti-Federalist defeat, the Bill of Rights represents an Anti-Federalist triumph.  In Massachusetts, New Hampshire, New York, and Virginia, Anti-Federalists were initially in the majority.  Ratification of the Constitution was achieved by narrow margins in these States only after Federalists pledged to work for the adoption of a Bill of Rights.  This pledge attracted the votes of a sufficient number of moderate Anti-Federalists to achieve ratification.  *See* Mannheimer, *Cruel and Unusual Federal Punishments*, *supra*, at 108-09; *see also* Michael J.Z. Mannheimer, *The Contingent Fourth Amendment*, 64 EMORY L.J. 1229, 1278-84 (2015).  Absent this promise of a Bill of Rights, the Nation we

10

know today might not exist. Accordingly, "Anti-Federalist political thought is essential to understanding the meaning of the Bill of Rights." CORNELL, *supra*, at 67; *see also* Robert C. Palmer, *Liberties as Constitutional Provisions, 1776-1791*, in CONSTITUTION AND RIGHTS IN THE EARLY AMERICAN REPUBLIC 55, 105 (Robert C. Palmer & William E. Nelson eds. 1987) ("The Antifederalist origin to the demand for a Bill of Rights dictates a state-oriented approach to the Bill of Rights." (footnote omitted)).

Doubtless, the Government will respond that the Supremacy Clause prevents the incorporation of state norms to limit federal power. *See* U.S. CONST., art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ."). But where such incorporation is demanded by a different provision of the Constitution, the Supremacy Clause can impose no impediment. Indeed, to hold that the Supremacy Clause somehow prevents us from ascribing to the Cruel and Unusual Punishments Clause its most natural reading based on text and history would be the ultimate irony. For it was precisely the Supremacy Clause, in conjunction with the broad swaths of power granted to the federal government in Art. I, that most concerned the Anti-Federalists and motivated them to demand a Bill of Rights that included a proscription on cruel and unusual punishments. *See* Mannheimer, *Cruel and Unusual Federal Punishments*, *supra*, at 128. At the risk of belaboring the obvious, the Eighth Amendment *amended* the Constitution. It amended the whole Constitution, including the Supremacy Clause. Thus, to claim that the Supremacy Clause can somehow trump the Eighth Amendment has it exactly backwards.

11

Indeed, the very text of the Supremacy Clause tells us why this argument is misguided. The Clause provides that federal statutes enacted "in Pursuance" of the Constitution are "the supreme Law of the Land." For all the reasons given above, the Federal Death Penalty Act, insofar as it authorizes capital punishment in non-death-penalty States, was not enacted "in Pursuance" of the Constitution but in violation of it. Accordingly, in those States, it is not supreme.

At the end of the day, the Supremacy Clause argument does no real work: either *Amicus* is correct about the meaning of the Eighth Amendment, in which case the Supremacy Clause argument is irrelevant; or *Amicus* is incorrect about the meaning of the Eighth Amendment, in which case the Supremacy Clause argument is unnecessary. Either way, the Supremacy Clause is beside the point; *Amicus*'s Eighth Amendment argument stands or falls on its own.

Moreover, the idea that some federal constitutional norms operate differently in different States, because they incorporate state law, is hardly novel. For example, the Due Process Clauses of the Fifth and Fourteenth Amendments, as well as the Takings Clause of the Fifth Amendment, refer to "property." But "[b]ecause the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source *such as state law*.'" *Phillips* v. *Washington Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 577 (1972) (emphasis added)). Likewise, the First Amendment may protect material in one State but not

another because of differing community standards on obscenity.  *See Sable Comms. of Cal., Inc.* v. *FCC*, 492 U.S. 115, 125-26 (1989).  And what may amount to ineffective assistance of counsel in violation of the Sixth Amendment in one State may be competent lawyering in another.  *See Wiggins* v. *Smith*, 539 U.S. 510, 524 (2003) (characterizing counsel's tactics as falling "short of the professional standards that prevailed *in Maryland* in 1989" (emphasis added)).  Perhaps most prominently, during the two-year period between June 26, 2013, *see United States* v. *Windsor*, 133 S.Ct. 2675 (2013), and June 26, 2015, *see Obergefell* v. *Hodges*, 135 S.Ct. 2584 (2015), those in same-sex marriages had a constitutional right to the same federal benefits as those in opposite-sex marriages, but only in States that recognized same-sex marriage.  This hardly means that the Due Process Clause of the Fifth Amendment means different things in different States.  Rather, the Clause uniformly protects some state institutions – there, same-sex marriage – from federal interference but only in those States where that institution exists.[8]  Likewise, the Eighth Amendment uniformly protects people from suffering certain federal punishments – here, the death penalty – but only in those States where the imposition of that punishment is unlawful.

Nor do the geographic disparities that would result from this interpretation of the Eighth Amendment pose any constitutional difficulties.  First, while the Due Process

---

[8] That *Obergefell* v. *Hodges*, 135 S.Ct. 2584 (2015), held that there was an independent constitutional right to same-sex marriage based on the Fourteenth Amendment does not alter the holding of *United States* v. *Windsor*, 133 S.Ct. 2675 (2013), that the Due Process Clause of the Fifth Amendment forbids federal interference with certain state institutions.

Clause of the Fifth Amendment contains an equal protection component, *see, e.g.,* *Windsor*, 133 S.Ct. at 2695, equal protection principles have never been thought to bar disparate treatment of people in different States based on a federal law's incorporation of differing state laws.  Distinctions based on geography do not offend equal protection principles unless they lack a rational basis.  *See Hodel v. Indiana*, 452 U.S. 315, 332 (1981); *Benner* v. *Oswald*, 592 F.2d 174, 181 (3d Cir. 1979).  And courts have soundly rejected the claim that federal criminal law that incorporates state law violates equal protection principles merely because it treats people differently depending upon the State in which their conduct occurs.  *See United States* v. *Yazzie*, 693 F.2d 102, 103-04 (9th Cir. 1982) (rejecting equal protection challenge to application of Major Crimes Act, 18 U.S.C. § 1153 ("MCA"), by which defendants were guilty of incest for conduct committed on portion of Native American reservation located in Arizona but would not have been guilty had the conduct occurred on portion of reservation located in New Mexico); *see also United States* v. *Vallie*, 284 F.3d 917, 922 (8th Cir. 2002) (similar).  Any different result would call into question the constitutionality of the MCA, the Assimilative Crimes Act,[9] and a number of other federal criminal laws that incorporate state law.  *See United States* v. *Sharpnack*, 355 U.S. 286, 294-96 (1958) (listing seven such federal statutes).  And if it is rational for Congress to expressly incorporate state law into a federal criminal statute, it is

---

[9] 18 U.S.C. § 13(a) (punishing as a federal crime "any act or omission" within the territorial jurisdiction of the United States that would be punishable by the State where the act or omission occurs).

rational for this Court to effectively do so to the extent required by the Eighth Amendment.

Finally, geographic disparities do not create an unacceptable measure of arbitrariness under *Furman* v. *Georgia*, 408 U.S. 238 (1972) (per curiam).  It is well known that stark geographic disparities in the administration of the death penalty already exist. *See* Robert J. Smith, *The Geography of the Death Penalty and Its Ramifications*, 92 B.U. L. REV. 227, 233 (2012) (observing that "fewer than 1% of counties in the country . . . account[] for roughly 44% of all death sentences").  Yet *Amicus* is unaware of a single case holding that such disparities violate the Constitution.  And even those judges who have suggested that geographic disparities do violate the Constitution have limited their claim to disparities *within a State*.  *See, e.g., Tucker* v. *Louisiana*, 136 S.Ct. 1801, 1802(2016) (Breyer, J., dissenting from denial of certiorari) ("One could reasonably believe that if Tucker had committed the same crime but been tried and sentenced . . . in, say, Bossier Parish, he would not now be on death row.").

No claim could reasonably be made that the Constitution forbids disparities in the administration of the death penalty *among the States*.  The framers and ratifiers of the Bill of Rights understood that questions of crime and punishment arouse strong sentiments that differ widely from place to place.  That is precisely why they carved out large chunks of the administration of federal criminal justice for state and local control – including, pursuant to the Jury Clause of the Sixth Amendment, the requirement of local juries in federal cases and, pursuant to the Cruel and Unusual Punishments Clause of the Eighth

15

Amendment, a state-based limitation on the maximum punishment available in federal cases. It would be inconsistent with that design to argue that the geographic disparities that inevitably result from these commands of the Bill of Rights somehow, at the same time, violate the Constitution. *See Glossip* v. *Gross*, 135 S.Ct. 2726, 2750 (2015) (Thomas, J., concurring) (observing that geographic disparities in the implementation of the death penalty, far from being "evidence of arbitrariness," seem to be the deliberate result of the constitutional right to a local jury). Geographic disparity is a feature, not a bug, of our criminal justice system.

     \*     \*     \*

  In sum, the meaning we ascribe to the Cruel and Unusual Punishments Clause should be that which the Anti-Federalists contemplated; they most likely contemplated that the Clause would prevent the federal government from inflicting punishments unauthorized by state law; and they understood that whether a punishment was "cruel and unusual" would necessarily vary by State. Such an interpretation does no violence to the Supremacy Clause and introduces no other constitutional difficulties.

  As Justice Thomas recently wrote, the federal government's decision to forego a constitutionally questionable practice for the first 200 years of its existence casts significant doubt on its constitutionality. *See* Luis v. United States, 136 S.Ct. 1083, 1099 (2016) (Thomas, J., concurring in the judgment). "[T]he lack of historical precedent . . . is [p]erhaps the most telling indication of a severe constitutional problem.'" Free Enterprise Fund v. Public Company Accounting Oversight Bd., 561 U.S. 477, 505–506

(2010) (internal quotation marks omitted).  The absence of a single federal death sentence from 1791 to 2002 for crimes committed in a State that absolutely forbids capital punishment speaks volumes.

For these reasons, a death sentence imposed upon Mr. Roland for a crime committed in New Jersey, which has banned capital punishment for close to a decade, would constitute "cruel and unusual punishment" in violation of the Eighth Amendment.

## CONCLUSION

For the reasons stated above, the Amended Notice of Intent to Seek the Penalty of Death should be stricken.

Respectfully submitted,

Zahid N. Quraishi, Esq.
RIKER, DANZIG, SCHERER,
HYLAND & PERRETTI, LLP
*Attorneys for Amicus Curiae,*
*Michael J. Zydney Mannheimer*

Michael J. Zydney Mannheimer
Professor of Law
Associate Dean for Faculty Development
Salmon P. Chase College of Law

Dated:  October 14, 2016

17

**CERTIFICATE OF SERVICE**

This is to certify that on this 17th day of October 2016, a copy of the foregoing motion papers and attached brief were filed electronically via ECF. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Zahid N. Quraishi