# STEPHEN GREENSPAN, Ph.D.
## Psychological Consultant

PO Box 620550                                    Licenses:
Littleton, CO 80162                                 Nebraska PSY-100295 (exp. 2019)
Tel.: (303) 948-3452                                Tennessee PSY-61136 (inactive).
E-mail: stephen.greenspan@gmail.com    Academic appointment:
                                                    Emeritus Prof. (Ed. Psych): UConn

Ms. Susan Marcus, Esq.                           February 22, 2017
29 Broadway, Suite 1412
New York, NY 10006                               Re: USA v Farad Roland


……………………………………………………………….

### DECLARATION OF STEPHEN GREENSPAN, PhD

I, Stephen Greenspan, declare and state that the facts contained in this Declaration are known to me personally and if called as a witness, I could and would testify thereto under penalty of perjury.

### Referral Request Underlying This Declaration

I am an expert in Psychology and Intellectual Disability, engaged by the attorneys for Farad Roland to assist in determining if he qualifies for a diagnosis of Intellectual Disability (ID, formerly known as Mental Retardation) prior to a Federal murder trial in which the government is seeking the death penalty. Note: I attempt to consistently use the current term Intellectual Disability (ID) but some quotes contain the older term Mental Retardation. Please know that these terms are referring to the same disorder.

I have been providing consultation around proper test and assessment procedures to use in ruling in or ruling out ID in a so-called "Atkins" procedure. In that capacity, I was asked to comment on a recent document from the US Government titled "United States' Response in Opposition to Defendant's Objections to Proposed Government Testing." I have also reviewed an affidavit submitted by Dr. Joel Morgan.

In this Declaration, I comment on four major points made in the government's response document and Dr. Morgan's Affidavit, and specifically indicate what I see to be misstatements or incorrect arguments on those points. My opinions are informed by extensive knowledge of the literature on ID assessment procedure.

1

## Documents Examined

- Letter listing tests which the government's expert wishes to use
- Defense Objections to Government's Testing
- Defense Objections to Additional Proposed Government Testing
- United States' Response in Opposition to Defendant's Objections to Proposed Government Testing
- Affidavit of Dr. Joel Morgan
- Data Summary by Dr. Scott Hunter

## My Qualifications

My qualifications are set out in Appendix A, which contains my *curriculum vitae*. Over the past dozen years, I have been qualified as an expert in psychology and mental retardation (MR), now increasingly referred to as Intellectual Disabilities (ID), by approximately 25 state or federal judges, in so-called "Atkins" (death penalty exemption) proceedings, at various stages: pre-trial, penalty and habeas. In addition, I have been used as a consultant in other cases where I did not testify, typically when ID was not found.

I am an Emeritus Professor of Educational Psychology at the University of Connecticut. I received a Ph.D. in Developmental Psychology from the University of Rochester, and was a Postdoctoral Fellow in Developmental Disabilities at the UCLA Neuropsychiatric Institute. I have been elected "Fellow" (a designation given only to the most qualified members) by the ID division of the American Psychological Association and by the American Association on Intellectual and Developmental Disabilities (AAIDD). I was also elected to a term as President of the Academy on Mental Retardation (at that time, the most prestigious research organization in the field).

I have received a license to practice psychology in the states of Nebraska (expiration 2019) and Tennessee (status: inactive). I have been awarded temporary visiting licenses to practice psychology in two other states. I have published extensively on Intellectual Disability (ID, formerly known as Mental Retardation), with special emphasis on "adaptive behavior." I am a leading scholar in the ID field, and my 2006 book "What is Mental Retardation?", co-edited with H. Switzky, is considered one of the standard reference works in the ID field. A 2015 edited book published by AAIDD, "The Death Penalty and Intellectual Disability," contains chapters by leading experts who have testified in Atkins proceedings. I am first or sole author of four chapters. I am also the most-cited authority in the two clinical diagnostic manuals: the 2010 AAIDD "green book" and the ID section in the 2013 DSM-5 (in the online edition, as the print edition does not list citations). I am also an authority on Fetal Alcohol Spectrum Disorders (FASD) – the main known cause of ID – as reflected in my being a keynote speaker at international FASD conferences, and my being the 2016 recipient of the Ann Streissguth Award for contributions to FASD and the Law.

In 2008, AAIDD granted me its highest honor, the Gunnar and Rosemary Dybwad Award for Humanitarianism. In August 2011, the Intellectual Disability division of the American Psychological Association awarded me one of its two highest honors, the John Jacobson Award for critical contributions to the field of ID theory and practice. My reports or writings have been cited positively, even in cases where I was not a participant.

**Major Points Made in Government's Response to Defendant's Objections**

Below are listed the four main points made in the government's response and Dr. Morgan's Affidavit. Following a brief description of each government point, I shall indicate whether and why I agree or disagree with that point. Note: As I am not an attorney, I am skipping (pages 1-9; 17-18; 21-22) any comment on purely legal issues.

**Point One (pages 11-14). Why the MMPI should be used**. The government indicates that the Minnesota Multiphasic Personality Inventory (the most current version is known as the MMPI-2-RF) should be administered to Mr. Roland. The reasons given by the government are that it: (a) provides possible symptoms of psychopathology which could make low IQ scores invalid, (b) psychopathology could rule out ID, and (c) the MMPI validity scales are good indicators of possible malingering.

    **Comment**:  I provide three reasons why the MMPI should not be administered to Mr. Roland.

    A. **Inappropriateness for use with someone with possible ID**. The MMPI-2 has 567 true-false items, while the MMPI-2-RF has 338 true-false items. For an average person, the MMPI-2-RF, with 338 items, is a lengthy test which requires considerable attention. Given Mr. Roland's low IQ score, neuropsychological impairments and a history of academic difficulty, it is my belief that the administration of the MMPI would be inappropriate. These concerns are noted in the manual for the MMPI-2 RF, which states that the usefulness of the test "depends heavily on the ability of the test subject to understand the test instructions, to comply with the requirements of the task, to comprehend and interpret the content of the items as they relate to him or her, and to record these self-attributions in a reliable way, and that a number of physical conditions or emotional states may impair this ability.  It is vital that the test administrator be alert to the presence of one or more incapacitating conditions, such as: limited visual acuity, dyslexia or receptive aphasia, learning disorder, drug or alcohol intoxication or withdrawal states, toxic reactions to various infectious agents or other organic deliria, disorientation arising from brain injury or concussion, post-seizure confusion in an epileptic disorder, or residual neurological impairment." Hathaway, S., & McKinley, J.C., MINNESOTA MULTIPHASIC PERSONALITY INVENTORY (MMPI-2) (1989), Columbus, OH: Merill/Prentice Hall, pp. 13–14.

B. **Mental Illness in No Way Is Incompatible with ID.** The government response implies that mental illness or emotional disorder could invalidate a diagnosis of ID. Even if the MMPI alone could be used to diagnose psychopathology (which it cannot), the fact is that ID is not an exclusionary diagnosis. In fact, having ID makes it more likely that one would also have some form of mental illness. Woods, G. Freedman, D., Derning, T. (2015). Intellectual Disability and Comorbid Disorders. In Edward A. Polloway (Ed.). *The Death Penalty and Intellectual Disability* (pp. 279-292 at p. 279) Washington, D.C. AAIDD ("More than 40% of people with intellectual disability (ID) are also clinically diagnosed with another form of mental illness. Co-occurring disorders are those which present in synergy, typically displaying interactive symptomatology."). Thus, the MMPI does not provide reliable information that is relevant for ruling in or ruling out a diagnosis of ID.

C. **The MMPI Validity Scales Are Not a Good Indicator of Malingering Low Cognitive Ability.** The Validity Scales on the MMPI were designed to detect if a subject is over- or under-reporting psychiatric symptoms, and (with the RF) also somatic / physical symptoms. This is a very different form of "malingering" than what we are talking about regarding how one scores on IQ or other cognitive tests.

There are two forms of possible maligning: faking (or denying) symptoms, and faking of low ability. The MMPI is relevant to the first kind, but irrelevant to the second kind (which is the only kind relevant for determining if someone has ID). For this second kind, the term "low effort" (rather than "malingering") should be used. There is no evidence that malingering (or denying) psychiatric symptomology has any validity for determining in someone is faking low IQ or making a poor effort on a cognitive test. The government implies that malingering is a general personality trait that can be applied to every test or activity someone engages in. In fact, even when using true "effort" tests (which the MMPI is not), evidence from the test should properly only be used to reflect on tests given on the same occasion by the same examiner. Thus, one cannot use scores on an effort test given at time B with examiner X, to say anything about scores obtained by examiner Y or Z, earlier at time A or later at time C. In my opinion, there is nothing useful to be obtained from giving the MMPI to Mr. Roland in terms of shedding light on his cognitive abilities or his efforts in taking cognitive tests.

The issue here is not whether administration of the MMPI in an ID assessment is never done (it is occasionally done, typically by clinicians who lack extensive training in ID). Rather, the issue is whether such administration is in line with accepted practice. I can say without reservation that there is nothing in the two

4

clinical manuals for diagnosing ID that supports the use of the MMPI in ruling ID in or out. In my professional opinion, use of the MMPI as proposed by the government is not congruent with relevant professional standards.

**Point Two (pages 14-Why the Vineland Should be Used).** The government argues the importance of adaptive behavior (also known as adaptive functioning), as reflected in *Hall v Florida* and the clinical ID literature. The government also asserts that the Vineland Adaptive Behavior Scale, 3rd edition (VABS-3) is a standardized instrument that is widely used in assessing ID.

**Comment.** As someone who has been studying adaptive behavior (AB) for decades, and whose writings form the basis for the current "tripartite" (social, practical, conceptual) model of AB, I obviously agree about the essential nature of establishing AB deficits when diagnosing ID. I also agree that the VABS-3 is a respected instrument that is frequently used when diagnosing or ruling out ID.

However, the government response (I believe) misses the point of the defendant's objection. The government's original letter proposed that their expert planned to administer the VABS-3 directly to Mr. Roland, with the defendant rating himself. Dr. Morgan's Affidavit also discusses the VABS-3 generally. But the defendant's objection indicated that this self-rating would be an inappropriate practice, both in relation to the VABS-3 itself and as a basis for arguing for or against a diagnosis of ID. I strongly agree with that objection, for these reasons:

A. **The VABS-3 Manual Prohibits Such Use.** In the manual for the VABS-3, it is stated (on page 16) that "…the Vineland-3 is not intended to be completed by self-report, and no cases in the normative sample were collected that way." The VABS-3 was designed to be administered to a third-party informant such as a parent, teacher or other adult who knows the person being rated. There are no self-reporting norms for the Vineland. This reason alone makes the use in the manner proposed by the government (with Mr. Roland rating himself) something that should be prohibited.

B. **Self-Descriptions by People with ID are Inherently Unreliable**. There is a well-established phenomenon called "cloak of competence" in which people with ID are very likely to lay claim to competencies which they lack. The reason is obvious: nobody wants to be seen as "retarded" or grossly incompetent, especially when their whole life has been marked by failure in school, work and in many other settings. So, even if the VABS-3 manual were to allow self-ratings (which it does not), such use should not be relied upon to make a diagnosis, as the obtained self-ratings have a high likelihood of being inaccurate.

C. **ID is a status conferred by society, and not by a person to himself.** A disability status, such as ID, is an indication of how someone is seen by various individuals and institutions in society. While a person's self-opinion should be taken into consideration when devising programs and services, it has no relevance for deciding if that person functions in a disabled manner. In my long experience as an expert on adaptive behavior, self-ratings of AB are unreliable and rarely relied upon by courts or disability-determining agencies.

**Point Three (pages 18—19). Inclusion of numerous effort tests is acceptable.** The government argues that administering multiple effort tests is an accepted psychological practice, in that it helps to determine if obtained scores on cognitive tasks, when low, are valid. In addition, the government asserts that as Mr. Roland has not yet been determined to have ID; thus that any argument about absence of people with ID in the norming samples has no relevance.

**Comment:** At least one effort test is typically administered when a forensic psychologist does a cognitive assessment. The question here is whether and why one should give multiple tests, and whether the tests suggested by Dr. Morgan are appropriate for someone with intellectual disability. Some problems with this practice are stated below:

A. **Common Practice is Not the Same Thing as Good Practice**. The purpose of an assessment is to shed light on a subject's abilities or traits. If one gives multiple effort tests, it is likely that one or more scores can be interpreted as falling in a borderline or suspect range. Berthelson L., Mulchan S. S., Odland A. P., Miller L. J., Mittenberg W. False positive diagnosis of malingering due to the use of multiple effort tests. Brain Injury. 2013; 27:909–916. This could enable an evaluator to cast doubt on obtained cognitive scores, even when they are perfectly valid. Furthermore, the assertion that different effort tests are tied to different kinds of cognitive assessments is without foundation. The fact that effort tests use different tasks is not justification for using multiple effort tests. The sole question to be asked is whether a test has validity for use with a particular population.

B. **In this case, the effort tests suggested by Dr. Morgan are not appropriate for persons with intellectual disability.**

G.S. Macvaugh and M. Cunningham (2009). Atkins v Virginia: Implications and recommendations for forensic practice. J of Psychiatry and Law, 37, 131-197 point to the unreliability of effort tests in cases involving ID and psychiatric disorders. For example, when the *Rey-15 Item Memory Test* was administered to individuals with severe psychiatric disorders and those with Intellectual

Disability, 38% of those with Intellectual Disability failed the Rey. Macvaugh and Cunningham also cite several other studies which indicate the unreliability of effort testing with people who have ID.

Karen Salekin, J. Gregory Olley, Krystal A. Hedge (2010), Offenders with Intellectual Disability: Characteristics, Prevalence, and Issues in Forensic Assessment, *Journal of Mental Health Research in Intellectual Disabilities*, 3:97–116 also conclude that "research on the use of existing measures of malingering has produced disappointing results and overall has demonstrated that existing measures and methods, when used according to the current standards of practice, often misclassify people with bona fide ID as malingerers." A similar conclusion is also stated in Karen L. Salekin & Bridget M. Doane, "Malingering Intellectual Disability: The Value of Available Measures and Methods, 16 Applied Neuropsychology 105, 111 (2009).

### C. The Issue of False Positives on Effort Tests Relates to the Possibility of Cognitive Impairment.

The government states that Mr. Roland has not yet been found to have ID. But the issue goes beyond the diagnosis of ID to cognitive impairment more generally. The relevance of this issue is that there is an assumption underlying effort tests that the items are so easily passed automatically, that failure on these tasks must indicate absence of effort. The problem is that this is an unproven assumption, and that for subjects suspected of intellectual disability, there is a strong likelihood that effort tests will be used to unfairly cast doubt on low scores which are in fact valid indicators of a person's actual ability deficits. See this quote: "patients with legitimate neurological and/or neuropsychiatric conditions fail SVTs for likely neurogenic factors." Bigler, E.D. (2012). Symptom validity testing, effort, and neuropsychological assessment. *Journal of the International Neuropsychological Society,* 18, 632-64.

**Point Four (page 20). The KBIT-2, used in combination with the WAIS, can accurately measure IQ and "rule out" Practice Effect.**

**Comment:** Practice Effect is a concern with the administration of multiple IQ tests within a short period of time, and best practices call for not administering the test within one year of it having been administered previously. Further, the KBIT-2 is a screening test and not an adequate substitute for a full scale IQ test. It will not "rule out" the Practice Effect. These claims are addressed below.

A. **Administering the WAIS-IV a second time inside of one year will produce a practice effect and an unreliable test result.**
"When individuals are tested repeatedly on Wechsler's [nonverbal and speeded] tasks, they no longer measure the kind of intelligence that thrives on novel problem-solving tasks with visual-spatial stimuli, and it becomes questionable whether they measure intelligence" (Kaufman, A. S., & Lichtenberger, E. 0. (2006). Assessing adolescent and adult intelligence (3rd ed.). New York: Wiley, p. 165)). "Practice effects on Wechsler's scales tend to be profound, particularly on the Performance Scale" *Id.* at 202. Dr. Kaufman notes "predictable retest gains in IQs" when similar tests are given within a short period of time. *Id.* There are tests that monitor speed, and "on second exposure subjects may be able to respond more quickly, thereby gaining in their scores." *Id.* at 204. "One year interval results in far less pronounced practice effects." *Id.* at 208. The AAIDD manual clearly states that "established clinical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence." *Id.* at 38.

B. **The KBIT-2 is a screening test, and is not a substitute for full scale IQ.** The KBIT-2 produces an IQ score; thus, it is incorrect for the government to assert that it measures something else. It is a screening measure of IQ, as Dr. Morgan acknowledges. As a screening test, the KBIT-2 has fewer items and a narrower range of items. It is not a substitute for a comprehensive IQ test such as the WAIS-IV. As the WAIS-IV is the most widely-used test for determining prong one eligibility in an "Atkins" (ID) assessment, and as defense expert Dr. Hunter has already used it, there is absolutely no reason for the government to administer the KBIT-2, as it is a less comprehensive measure and its score does not provide any additional information that is not more validly obtained by the WAIS-IV.

C. **There is No Evidence to Indicate that the Practice Effect Does Not Apply to the KBIT-2.** The KBIT stands for "Kaufman Brief Intelligence Test." It was developed by Dr. Alan Kaufman, who was a collaborator with the late Dr. David Wechsler in the development of the original Wechsler (WISC, WAIS) scales, has written guidebooks for psychologists in the interpretation of Wechsler IQ testing, and is also the person who first discovered the Practice Effect and continues to write about it. The KBIT covers much of the same territory as the WISC and WAIS, as reflected in the fact that is correlates well with scores on the Wechsler scales. In fact, there is literature to suggest that scores on IQ tests show an increase when a person is tested repeatedly, even

8

    when different tests are used, because they are familiar with the experience of repeating the same kinds of items. Salthouse, T. Why Are There Different Age Relations in Cross-Sectional and Longitudinal Comparisons of Cognitive Functioning? Current Directions in Psychological Science 2014, Vol. 23(4) 252–256.

D. **The KBIT-**2 will not "rule out" the practice effect. I know of no literature to support that claim.

## CONCLUSION

I have addressed the four major points contained in the government's response: (1) use of the MMPI, (2) use of the Vineland in a self-rating format, (3) use of multiple effort tests, and (4) the Practice Effect and the use of KBIT to "rule out" the Practice Effect. I believe my assertions are accurate and justified by my understanding of best practice in the assessment of Intellectual Disability.

    Signed under penalty of perjury in Littleton, Colorado on the 22nd of February, 2017.

*[signature]*

Stephen Greenspan, PhD
Psychological Consultant

9

**APPENDIX A—BRIEF VITA FOR STEPHEN GREENSPAN**   Updated Feb. 2017

Address: 9424 Erin Lane
   Littleton, CO 80127  USA
   office/ home: 303/ 948-3452   cell: 720/ 341-5404
   stephen.greenspan@gmail.com
   website: www.stephen-greenspan.com

Personal: U.S. Citizen, Excellent Health
   Married (Helen Apthorp), two adult children (Alex, Eli)

Education: Bronx H.S. of Science
   Johns Hopkins University, BA (Liberal Arts)
   Northwestern University, MA (History)
   Univ. of Rochester, MA, PhD (Developmental Psychology)
   UCLA, Post-Doc (Developmental Disabilities)

Employment:
   Assistant Professor of Psychology, George Peabody College
      for Teachers of Vanderbilt University, 1977-1979.
   Scientist, Boys Town Center for the Study of Youth
      Development, Omaha, NE, 1979-1985.
   University of Connecticut, Department of Educ. Psychology.
      Assoc. Prof.,1985-1994.Tenure-1989. Professor, 1995-. Emeritus 1998-.
   University of Colorado Health Sci. Center, Vol. Clin. Faculty, 2000-2015
   .
Professional Affiliations:
   American Psychological Association (Fellow)
   American Psychological Society (Fellow)
   Amer. Assn. on Mental Retardation, now AAIDD (Fellow)
   Academy on Mental Retardation, Board Member ('90-'99) President (95-97)

Certifications:
   Licensed Psychologist, State of Nebraska (#100295, exp. Jan. 2017).
   Licensed Psychologist, State of Tennessee (#P-636) inactive status.

Major Consultancies/ Volunteer Activities
   Member of Science and Policy Advisory Committee, for 1995
      Int'l Spec. Olympics Summer Games, 1993-1995.
   Member, Connecticut Developmental Disabilities Planning
      Council (Gubernatorial appointment), 1994-1998.
   Chair, Connecticut Office of Protection and Advocacy
      for Persons with Disabilities (Governor's Appointment)  1997-1998.
   Expert consultant in several criminal cases.

<u>Community Service</u>
   Former president and lay leader, Beth Ami-Colorado Congregation for
      Humanistic Judaism, Denver and Boulder, Colorado.

<u>Service to Own Institution</u>
   Member, Graduate Faculty Council, University of
      Connecticut, 1988-1993.
   Member, Executive Committee of the Graduate School,
      University of Connecticut, 1989-1993.
   Chair, Committee on Faculty Standards, University of
      Connecticut Graduate Faculty Council, 1989-1993.
   Chair, Blue Ribbon Panel on the Future of Doctoral
      Studies, University of Connecticut School of Education, 1989-1990.
   Member, University Senate, University of Connecticut,
      Fall semester, 1990.

<u>Theoretical Contributions</u>
   Comprehensive model of personal competence and adaptive behavior
      (incorporating the tripartite model of intelligence)
   Model of parenting competence (9-principle model of caregiver discipline)
   Action model of gullibility, foolishness, common sense and wisdom

<u>Honors</u>
   Elected Fellow, American Psychological Association
   Elected Fellow, American Psychological Society
   Elected Fellow, American Assn. on Mental Retardation
   Willowbrook Memorial Lecturer, CUNY-Staten Island
   Dybwad Award for Humanitarianism, Amer. Assn. on Int. and Dev. Disability
   Jacobson Award for Contributions to Int. Disability, Am. Psychological Assn.
   Most-cited author, 2002 and 2010 AAIDD manuals, DSM5 section on ID
   Hastdorf Lecture, Mt. Holyoke College, November 2012
   Featured speaker, consensus conference on FASD and Law, Edmonton, 2013
   Streissguth Award for Contributions to FASD and the Law, 2016

<u>Books and Monographs</u>
Greenspan, S. (1978). Maternal affect-allowance and
limit-setting appropriateness as predictors of child adjustment.
*Genetic Psychology Monographs, 98,* 83-111.

Karan, O. & Greenspan, S. (Eds.) (1995). *Community rehabilitation
services for persons with disabilities.* Boston: Butterworth-Heinemann Publishers.

Switzky, H.N. & Greenspan, S. (Eds.) (2006). *What is Mental Retardation?: Ideas
for an evolving disability in the 21st century*. (Rev. ed.) Washington: AAIDD.

Greenspan, S. (2009). *Annals of gullibility: Why people are duped and how they can
avoid it.* Westport, CT: Praeger/ Greenwood.

Case 2:12-cr-00298-ES   Document 291   Filed 02/22/17   Page 12 of 15 PageID: 3819

Greenspan, S. (2012). *Elements of discipline. Nine principles for teachers and parents.* Philadelphia: Temple University Press.

Greenspan, S. (in preparation). *Anatomy of foolishness: The Problem of Risk-Unawareness.*

Greenspan, S. (in preparation). *America's Fool: Cognitive Limitations of Donald Trump*

Chapters in Books   (selected)

Greenspan, S. (1979). Social intelligence in the retarded. In N.R. Ellis (Ed.), *Handbook of mental deficiency: Psychological theory and research.* Second edition. Hillsdale, N.J.: Erlbaum.

Greenspan, S. (1981). Defining childhood social competence: A proposed working model. In B.K. Keogh (Ed.), *Advances in Special Education.* Volume 3. Greenwich, CT: JAI Press.

Greenspan, S. (1981). Social competence and handicapped individuals: Practical implications of a proposed model. In B.K. Keogh (Ed.), *Advances in Special Education. Vol. 3.* Greenwich, CT: JAI.

Greenspan, S. and Budd, K.S. (1986). Research on mentally retarded parents. In J.J. Gallagher & P. Vietze (Eds.), *Families of handicapped persons: Current research, treatment and policy issues.* Baltimore: Paul Brookes & Co.

Greenspan, S. & Love, P. (1995). Ethical challenges in supporting persons with disabilities. In O. Karan & S. Greenspan, (Eds.), *Comm. Rehabilitaion services for persons with disabilities.* Newton, MA: Heinemann.

Greenspan, S. (1995). There is more to intelligence than IQ. In D.C. Connery (Ed.), *Convicting the innocent.* Brookline Books.

Greenspan, S., Switzky, H & Granfield, J. (1996). Everyday intelligence and adaptive behavior: A theoretical framework. In J. Jacobson & J. Mulick (Eds.), *Manual on diagnosis & professional practice in mental retard'n.* Amer. Psychogical Assn.

Greenspan, S. & Love, P. F. (1997). Social intelligence and developmental disorder: Mental retardation, learning disabilities and autism.  In W.F. MacLean, Jr. (Ed.) *Ellis' handbook of mental deficiency*, 3rd ed. Mahwah, NJ: Erlbaum.

Greenspan, S. & Driscoll, J. (1997). The role of intelligence in a broad model of personal competence. In D.P. Flanagan, J. Genshaft & P. Harrison (Eds.), *Contemporary intellectual assessment: Theories, tests and issues*. New York: Guilford.

Greenspan, S. (1998). A contextualist perspective on adaptive behavior. In R. Schalock (Ed.), *Measuring adaptive behavior.* Washington, DC: American Association on Mental Retardation.

Greenspan, S., Loughlin, G. & Black, R. (2001). Credulity and gullibility in persons with mental retardation. In L.M. Glidden (Ed.), *International Review of Research in Mental Retardation* (Vol. 24, pp. 101-135). New York: Academic.

Greenspan, S. & Switzky, H.N. (2006; rev. ed.). Lessons from the Atkins decision for the next AAMR manual. In H.N. Switzky & S. Greenspan (Eds.), *What is Mental Retardation?: Ideas for an evolving disability in the 21st century. (*pp. 281-300). AAMR.

Greenspan, S. (2009). Foolish action in adults with Intellectual Disabilities: The forgotten problem of risk-unawareness. In L. M. Glidden (Ed.), *International Review of Research in Mental Retardation*. New York: Elsevier.

Greenspan, S. & Woods, G. (2015). Social Incompetence of FASD Offenders: Risk-Awareness as a Factor in Criminal Culpability. In E. Jonsson & S. Clarren (Eds.), *Brain Damage and the Law*. Edmontonj, Canada. .

Harris, J.C. & Greenspan, S. (in press). Nature and definition of intellectual and developmental disabilities. In N.N. Singh (Ed.), Clinical handbook of evidence-based practices for individuals with IDD. New York: Springer.

Greenspan, S. & Switzky, H.N. (2015). Age of onset and the developmental criterion. In E.Polloway  (Ed.), *The death penalty and intellectual disability: A guide.* Washington, DC: AAIDD.

Greenspan, S. & Olley, G. (2015). Variability of IQ scores. In E.Polloway (Ed.), *The death penalty and intellectual disability: A guide.* Washington, DC: AAIDD.

Greenspan, S. (2015). Evolving conceptions of adaptive behavior.  In E.Polloway (Ed.), *The death penalty and intellectual disability: A guide.* Washington: AIDD.

Greenspan, S. (2015). The Briseno factors. In E.Polloway (Ed.), *The death penalty and intellectual disability: A guide.* Washington, DC: AAIDD.

Greenspan, S. & Woods, G. (2016). Personal and situational factors in financial crime victimization. In M. Dion & D. Weisstub (Eds.), *Financial Crimes: Technology, Psychology, and Ethics.* Amsterdam: Springer.

Greenspan, S. (2016). Discriminatory killing and execution of people with ID. In J.R. Lutzker, K. Guastaferro, & M. Graham (Eds.), *Maltreatment of People with Intellectual and Developmental Disabilities.* Washington, DC: AAIDD.

Greenspan (2016). Explaining gullibility of service providers towards treatment fads. In J. Mulick & R. Foxx (Eds.), *Controversial Therapies for Autism and Intellectual Disabilities.* Erlbaum.

Greenspan, S. & Woods, G. (in press). Social Incompetence of FASD Offenders: Risk-Awareness as a Factor in Criminal Culpability. In E. Jonsson & S. Clarren (Eds*.), Brain disorders and the law*. Amsterdam: Springer.

Greenspan, S., Brown, N. N. & Edwards, W. (2015). FASD and the    concept of "intellectual disability equivalence." In M. Nelson & M. Trussler (Eds*.), Law and Ethics in Fetal Alcohol Spectrum Disorder.* Amsterdam: Springer.

Greenspan, S. (2015). Broadening guardianship and lowering barriers to service eligibility. In I Binnie, & E. Jonsson (Ed), *Legal issues of FAS: Proceedings from a consensus conference.* Edmonton: Institute of Health Economics..

Greenspan, S. & Driscoll, J.M. (2015). Why people with FASD fall for manipulative ploys: Ethical limits of interrogators' use of lies. In M. Nelson & M. Trussler (Eds*.), Law and Ethics in FASD and the law*. Amsterdam: Springer.

Greenspan, S. & Driscoll, J. M.. (in press). Naïve offenders: Violence and intellectual disability. In J.M. Fabian (Ed.), *Neuroscience and violence risk in criminal offender populations*. Portsmouth, UK: Wiley & Sons.

Harris, J.C. & Greenspan, S. (2016). Definition and Nature of intellectual and developmental disabilities. In N.N. Singh (Ed.), Clinical handbook of evidence-based practices for individuals with IDD. New York: Springer.

Articles in Refereed Journals            (selected)

Greenspan, S. and Shoultz, B. (1981). Why mentally retarded adults lose their jobs: Social competence as a factor in work. adjustment. *Applied Research in Mental Retardation, 2,* 23-38.

Greenspan, S. and Delaney, K. (1983). Personal competence of institutionalized adult males with or without Down syndrome. *American Journal of Mental Deficiency, 88,* 218-220.

Greenspan, S. & Granfield, J.M. (1992). Reconsidering the construct of mental retardation: Implications of a model of  social competence. *AJMR, 96,* 442-453.

Greenspan, S. (1997). Dead manual walking?: Why the AAMR definition needs redoing. *Education and Training in Mental Retardation and Developmental Disabilities, 32,* 179-190.

Greenspan, S. (2002). A sex police for adults with mental Retardation? Comment on Spiecker and Steutel. *Journal of Moral Education, 31,* 171-179.

Greenspan, S. & Switzky, H.N. (2003). Execution exemption should be based on actual vulnerability, not disability label. *Ethics and Behavior*.

Greenspan, S. (2006). Gullibility in persons with high-functioning autism. *Autism Spectrum Quarterly, 8*, 14-16

Greenspan, S. (2009). Introduction and overview of the special "Atkins" issue. *Applied Neuropsychology*.

Greenspan, S. (2011). Intellectually disabled homicide defendants: Issues in diagnosis in capital cases. *Exceptionality* (Fall issue).

Woods, G.W., Greenspan, S. & Agharkar, B. (2011). Ethnic and cultural factors in identifying FASD. *Journal of Psychiatry and Law, 39.  9-37*.

Greenspan, S. (2011). Execution of Joe Arridy: Comments of a forensic expert. *Intellectual & Developmental Disabilities*, *49* (3), 197-202.

Greenspan, S. & Woods, G.W. (2014). Intellectual Disability as a disorder of reasoning and judgment: The gradual move away from IQ ceilings. C*urrent Opinion in Psychiatry*. (solicited paper for a special issue)

Haydt, N., Greenspan, S. & Aghharkar, B.S. (2014). Advantages of DSM-5 in the diagnosis of ID: Reduced reliance on IQ ceilings in Atkins *UMKC Law Review*

Greenspan, S., Harris, J.C & Woods, G.W.  (2015). Intellectual Disability is "a condition, not a number": Ethics of IQ cut-offs in psychiatry, human services and law. *Ethics, Medicine and Public Health: A Multidisciplinary Journal.*

Greenspan, S. (in press, 2017). Capturing the cognitive essence of IDD: Explaining the "relatedness" clause in DSM-5. *Psychology in Intellectual Disability and Autism.*  (in a special issue on the relatedness issue)

Greenspan, S. (in press, 2017).  Borderline Intellectual Functioning: An update. *Current Opinion in Psychiatry.*